UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

BAR MANDALEVY; DAVID
GRIGSBY; and JOSEPH SHEPARD,
individually and on behalf of all others
similarly situated,

Plaintiffs,

v.

BofI HOLDING, INC.; GREGORY
GARRABRANTS; ANDREW J.
MICHELETTI; ESHEL BAR-ADON; and
PAUL J. GRINBERG,

Defendants.

Case No.:  3:17-cv-00667-GPC-KSC

**ORDER GRANTING MOTION TO
DISMISS**

**[ECF No. 32]**

Before the Court is a motion to dismiss the operative Class Action Complaint (the "CAC") filed by Defendants.  (ECF No. 32.)  The motion has been fully briefed.  (*See* ECF No. 34 (Plaintiffs' Response in Opposition); ECF No. 35 (Defendants' Reply).)  For the reasons set forth below, the Court GRANTS the motion to dismiss.  Because supplementation of the complaint may cure the deficiencies discussed below, the Court grants Plaintiffs leave to amend their pleadings.

//

//

1

# I.   Allegations

Defendant BofI Holding, Inc., is the holding company for BofI Federal Bank.[1] (CAC, ECF No. 27, at ¶ 2.)  BofI is a nationwide bank that provides consumer and business banking products through "multiple brands." (*Id.* ¶¶ 30–31.)  Defendant Gregory Garrabrants is the CEO and President of BofI.  (*Id.* ¶ 25.)  Defendant Andrew J. Micheletti is BofI's Executive Vice President and CFO.  (*Id.* ¶ 26.)  Defendant Eshel Bar-Adon is BofI's Chief Legal Officer and Executive Vice President, Specialty Finance.  (*Id.* ¶ 27.)  Defendant Paul J. Grinberg sits on BofI's Board of Directors, has served as the Chairman of that board since February 16, 2017, and served as Chairman of BofI's Audit Committee until February 2017.  (*Id.* ¶ 28.)  Grinberg also serves as Chairman of the Compensation Committee and, as of February 2017, BofI's Nominating Committee.  (*Id.*)

Seeking to represent a class of individuals who purchased BofI stock between March 14, 2016, and October 24, 2017 (*id.* ¶¶ 1, 23), Plaintiffs assert two claims against Defendants: (1) violation of Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), by way of violation of the SEC's Rule 10b-5, 17 C.F.R. § 240.10b-5, and (2) violation of Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a).  (*Id.* ¶¶ 134–48.)  Plaintiffs contend that Defendants violated Sections 10(b) and 20(a) by making, or causing BofI to make, misrepresentations about (1) whether federal regulators were investigating BofI "in connection with money laundering, related party transactions, and other improper activity," and (2) whether BofI engaged in "lending, directly or indirectly, to criminals."  (ECF No. 34 at 1.)

## A. Loans to "Risky" Individuals

On August 22, 2015, the *New York Times* published an article entitled "*An Internet Mortgage Provider Reaps the Rewards of Lending Boldly*," suggesting that BofI was lending to "unsavory characters who were later found to have run afoul of the law."  (*Id.*

---

[1] For ease of discussion, the Court will refer to the bank defendant as "BofI."

¶¶ 5, 33.)  The article listed multiple instances of BofI having issued loans to individuals who later were convicted or accused of fraud, and others who had defaulted on large loans to other banks.  (*Id.* ¶ 33.)  It also discussed BofI's practice of making loans to "foreigners," which, according to the article's author, invites anti-laundering scrutiny from regulators.  (*Id.*)

In October 2015, a former BofI auditor named Charles Matthew Erhart filed a whistleblower protection suit against BofI.  In the complaint, Erhart alleges that he observed BofI lending to "criminals and politically exposed persons" in potential violation of the Bank Secrecy Act's Anti-Money Laundering Rules ("BSA/AML rules").  (*Id.* ¶ 6; *see Erhart v. BofI Holding, Inc.*, No. 3:15-cv-02287-BAS-NLS (S.D. Cal.).)  Erhart alleges that, during his time at BofI, he observed conduct suggesting that (1) BofI management was altering financial statements, (2) BofI had falsely responded to an SEC subpoena asking for customer account information, (3) BofI falsely told the Office of the Comptroller of the Currency ("OCC") that it had no accounts for customers without tax identification numbers, and (4) BofI had "failed to disclose loans to criminals and politically exposed persons who put the Bank at risk for violating the" BSA/AML rules.  (*Id.* ¶ 34.)  Erhart's complaint also alleges that he "uncovered information that many of [BofI's] borrowers were criminals, even notorious criminals, and other suspicious persons who put the bank at high risk of violating the [BSA/AML rules] as well as exposing the Bank to reputational risk."  (*Id.* ¶ 35.)

The CAC refers to a confidential witness known as "CW3" who worked as a BofI underwriter between July 2014 and August 2016.  While at BofI, CW3 "heard talk of accusations made by regulators that BofI was loaning money to criminals."  (*Id.* ¶ 38.)

On August 3, 2016, an article on the website *Seeking Alpha* was published with the title "*Court Filings Reveal Existence of Undisclosed Second Alleged BofI Whistleblower*."  The article asserted that BofI "took specific legal steps to conceal details regarding a second 'whistleblower' from the public court system."  (*Id.* ¶ 39.)  The article cited a state court action, *BofI Federal Bank v. Golub*, No. 37-2016-4902 (San

Diego Co. Ct. 2016), in which BofI sought to enjoin Veronica Golub, a former Assistant Vice President, from using BofI information to "assist in government investigations." (*Id.* ¶ 40.) A filing in that lawsuit stated that Golub was responsible for performing quality control on single-family loans and reporting deficiencies that could impact credit decisions or affect the salability of a loan. (*Id.*) According to the article, this filing "shattered" BofI's prior statements that its whistleblower activity was confined to Erhart, and that Golub's potential status as a whistleblower "casts significant doubt on BofI's internal investigations. (*Id.* ¶ 41.)

On October 26, 2016, an article was published on *Seeking Alpha* entitled "*Barry Minkow? Jason Galanis? Just When I Thought I Had BOFI Figured Out… There's More!*" (*Id.* ¶¶ 8, 80, 108.) In a disclaimer at the bottom of the article, the author states that "[a]ll information for this article was derived from publicly available information."[2] (ECF No. 32-8 at 18.[3]) This article suggested that BofI made "indirect" loans to "a convicted fraudster" named Jason Galanis by funding a special purpose entity that Galanis used "for financing." (CAC ¶ 8, 80, 108; *see also id.* ¶ 42.) According to the article, Galanis took out a $7 million loan from one of these entities in 2015, but the loan went into delinquency after Galanis's arrest. (*Id.* ¶ 42.) The author of the article stated that investors "ought to ask/wonder how this loan is being reflected on BofI's balance sheet and/or if management will speak to said Galanis ties during the next earnings call," and that the author believed "that a reasonable person could infer that Galanis has a relationship with BofI that remains undisclosed to this date." (*Id.*) According to the article, BofI "holds the collateral behind the loan that is now delinquent and the subject of messy foreclosure proceedings that involve the DOJ." (*Id.* ¶ 8.) Two days after this

---

[2] The Court takes judicial notice of the contents of the *Seeking Alpha* and *New York Post* articles referenced in the CAC. *See In re BofI Holding, Inc. Secs. Litig.*, No. 3:15-cv-02324-GPC-KSC, 2018 WL 1410729, at *7 n.5 (S.D. Cal. Mar. 21, 2018) (taking judicial notice of the complete contents of *Seeking Alpha* articles referenced in the complaint).

[3] The Court's citations to pages of the parties' filings refer to the pagination provided by the CM/ECF system.

article was published, BofI stock fell 14.53%.  (*Id.* ¶¶ 9, 110.)

### B. Regulatory Investigations

On May 28, 2015, the SEC opened an informal inquiry, or a Matter Under Inquiry ("MUI"), into BofI.  (*Id.* ¶ 46.)  On February 11, 2016, the SEC closed the MUI and began a formal investigation.  (*Id.* ¶ 47.)  The SEC issued a subpoena to BofI on February 22, 2016, which inquired into BofI's related party transactions, potential conflicts of interest, and loans made to Encore Capital Group, Inc. ("Encore") and Propel Financial Services, LLC ("Propel").  (*Id.* ¶ 49.)  At the time, Grinberg was the CFO of Encore. (*Id.* ¶ 50.)  In 2012, BofI issued a loan to Encore, which by then had acquired Propel.  (*Id.*) According to Plaintiffs, the fact that this deal was permitted to go through constitutes "a deficiency of internal controls," and it also should have been disclosed by BofI as a related-party transaction.  (*Id.*)  The SEC was also interested in seeking information about a March 2012 loan made to Johnathan Ball, BofI's Chief Internal Auditor, who was responsible for auditing all related-party transactions.  (*Id.* ¶ 51.)  BofI did not disclose the existence of the SEC's February 22 subpoena.  (*Id.* ¶ 49.)

On October 19, 2016, the SEC issued a second subpoena seeking "numerous documents related to single-family residential loans extended to a non-resident alien." (*Id.* ¶ 52.)  BofI never disclosed the existence of this subpoena.  (*Id.*)

Relying on statements by confidential witnesses, Plaintiffs assert that the Individual Defendants were aware of the SEC's formal investigation into BofI.  (*Id.* ¶ 54.)  in 2016, Garrabrants and Micheletti told CW1— a former Senior Mortgage Officer and Team Lead between February 2015 and June 2017—about the SEC probe into BofI. (*Id.* ¶ 55.)  According to CW2, who worked as a Mortgage Consultant between May 2013 and August 2016, so many federal regulators were in BofI's offices during CW2's tenure that there was "no way for [] Garrabrants and Micheletti . . . to miss" them.  (*Id.* ¶ 58.) CW4, who worked as an Assistant Vice President, Processing Manager in Residential Lending, stated that BofI's management found ways not to provide documents to the compliance department and planned strategy on how to hide misconduct from regulators.

(*Id.* ¶ 59.)  According to CW5, who worked as a Marketing Analyst from July 2015 to March 2017, federal probes from regulators other than the OCC were "ongoing" throughout CW5's tenure, and Garrabrants and Micheletti knew about them.  (*Id.* ¶ 60.)

On March 31, 2017, the *New York Post* published an article entitled "*Feds Probe [BofI] for Possible Money Laundering*."  (*Id.* ¶¶ 11, 93, 111.)  The article indicated that the DOJ, SEC, and Treasury Department were investigating BofI and Garrabrants.  (*Id.*)  It stated that the regulators had interviewed "at least one former employee," and that part of the "probe" was focused on regulatory filings BofI made to the OCC.  (*Id.*)  By the end of March 31, BofI stock dropped 5.26%.  (*Id.* ¶¶ 12, 113.)

On April 6, 2017, the *New York Post* published an article entitled "*Feds Probe of [BofI] Helped by Aquarium Employee*."  (*Id.* ¶¶ 13, 114.)  The article stated that the husband of Kristi Procopio—BofI's "former marketing boss"—had "pocketed hundreds of thousands of dollars" by engaging in sham "consulting" for BofI's marketing.  (*Id.*)  Both were convicted of embezzlement in 2016, and Procopio had recently given information about BofI's "alleged lax accounting and possible money laundering" to the entities investigating BofI.  (*Id.*)  On April 7, BofI stock dropped .01%.  (*Id.* ¶¶ 14, 115.)

On June 28, 2017, the SEC sent BofI a letter stating that it did "not intend to recommend any enforcement action" against BofI.  (*Id.* ¶ 119.)  The SEC warned, however, that its letter "must in no way be construed as indicating that [BofI] has been exonerated or that no action may ultimately result from the staff's investigation."  (*Id.*)

On October 25, 2017, the *New York Post* published an article entitled "[*BofI*] *Was Under 16-Month SEC Investigation*."  (*Id.* ¶¶ 15, 116.)  The article stated that, according to information obtained via FOIA by *Probes Reporter*, the SEC investigated BofI for 16 months until closing the investigation in June 2017.  (*Id.*)  On October 26, BofI stock fell 4.57%.  (*Id.* ¶¶ 16, 118.)

### C. Statements

According to the CAC, Defendants made the following statements about BofI's lending practices and regulatory investigations.

### i. SEC Filings

#### a. Assertions about Erhart

On March 14, 2016, BofI filed a Form 8-K that included discussion about Erhart's accusations. (*Id.* ¶ 64.) According to the statement, BofI's Audit Committee engaged Dentons US LLP to investigate Erhart's accusations, and "[a]fter an extensive investigation, Dentons advised the Audit Committee that, based on its investigation, it found no support for the conclusions of Mr. Erhart in the Complaint that the Bank or management engaged in wrongdoing or acts of fraud or impropriety." (*Id.*)

#### b. Financial Statements

On April 28, 2016, BofI filed its Form 10-Q, which announced BofI's financial and operating results for the most recent quarter. (*Id.* ¶ 66.) It set forth several assertions about BofI's net income and revenue. (*Id.*)

BofI filed subsequent SEC filings, signed by Garrabrants and Micheletti, containing analogous financial information. (*Id.* ¶¶ 75, 78, 82–83, 86–87, 95–96, 100, 103.) In the Form 10-Ks that included such information, BofI also stated that it "must comply with federal anti-money laundering, tax withholding and reporting, and consumer protection statutes and regulations." (*Id.* ¶¶ 76, 101.)

#### c. Code of Ethics and Statement of Ethical Principles

BofI's April 28, 2016 10-Q stated that it had recently amended its Code of Ethics, but that the substance of the new code "remained substantially consistent with" the prior version. (*Id.* ¶ 67.) The new version of the Code of Ethics stated that its personnel "will conduct business in accordance with [its] ethical standards"; that its personnel "are expected to provide to shareholders and financial markets proper disclosure in (i) reports and documents that [it] filed with or submits to the [SEC] and (ii) in other public communications, if applicable"; that its personnel "must comply with Applicable Laws" when performing their duties; that all personnel "shall endeavor to promote compliance with this Code" by reporting violations; and that all personnel must be familiar with BofI's code of ethics. (*Id.* ¶ 68.)

On March 16, 2017, the Board of Directors reaffirmed BofI's "Statement of Ethical Principles." (*Id.* ¶ 90.) The introduction to that statement, signed by Garrabrants and Grinberg, states that BofI is committed to ethics and integrity, seeks to uphold its values and reputation, and that every member of BofI's team "is expected to demonstrate a personal commitment to professional integrity and sound ethical judgment." (*Id.*) The introduction also stated that the Statement of Ethical Principles is meant "to guide all Team Members" and serve as the foundation of BofI's code of ethics. (*Id.*) The statement itself asserts that team members are expected to comply with all relevant laws and policies, that BofI is committed to compliance, that BofI "recognizes" a core commitment to ethics, that BofI "complies with disclose and reporting requirements under Applicable Law," that all team members are expected to support BofI's objectives in doing so, and that BofI "recognizes" the importance of accurate reporting. (*Id.* ¶ 91.)

### ii. Press Releases and Conference Calls

On April 18, 2016, BofI issued a press release about recent volatility in its share price. (*Id.* ¶ 65.) That statement included an assertion that "BofI, like other banks, is regularly examined by its federal regulators," and that "[t]he absence of public enforcement actions highlight how disconnected [Erhart's] allegations are from the reality of BofI's highly compliant and top-performing business." (*Id.*)

On April 28, 2016, BofI held an earning conference call during which Garrabrants stated that BofI "is in a strong regulatory standing, with no enforcement actions, has not been fined a single dollar by any regulatory agency and has not been required to modify its products or business practices." (*Id.* ¶ 71.) Garrabrants also stated that BofI remained "in excellent regulatory standing" and that BofI "has never been healthier." (*Id.*)

During an August 2, 2016 earnings conference call, Garrabrants discussed Dentons' investigation, and he explained that investigation resulted in a finding that Erhart's allegations were without a factual basis. (*Id.* ¶ 73.) Garrabrants also stated that BofI "has completed two record-setting fiscal years," and had "closed two acquisitions that both required regulatory approval and successfully completed multiple OCC and

Federal Reserve Regulatory examinations." (*Id.*)  Garrabrants repeated his statement from April 28 regarding BofI's strong regulatory standing, and asserted that BofI is in "constant dialogue with regulators, including the OCC, SEC, FDIC, and the Fed." (*Id.*) He stated that despite there being constant dialogue with these regulators, "I think the important thing to note and what's the most important is if there is any event that's occurred that would require disclosure, the answer is absolutely no." (*Id.*)  He continued:

> So we've not been asked any question or received any inquiry from any agency, including the SEC that would suggest concerns regarding financial misrepresentation, financial results, estimates, or other matters that would require an 8-K. . . . We have no enforcement actions and we frankly don't have any issues that would lead me to think that we have to change any since thing about what we're doing. . . . And so allow me to repeat.  We have not been asked any questions that or received any inquiry that would suggest any concerns about our financials, financials misrepresentations, financial results estimates or anything else that would require the filing of an 8-K, meaning that would be material.

(*Id.*)

During an October 27, 2016 earnings conference call, Garrabrants responded to the *Seeking Alpha* article alleging ties between BofI and Jason Galanis.  (*Id.* ¶ 84.) Garrabrants stated that BofI "has no interest credit exposure ownership of any loan, any kind of loan to Jason Galanis or any loan to Galanis who is a guarantor including the $7 million loan mentioned in the hit piece." (*Id.*)  Garrabrants repeated his earlier statements about Denton's investigation, BofI's success in the previous two years, and BofI's strong regulatory standing "with no enforcement actions." (*Id.*)

During a January 31, 2017 earnings conference call, Garrabrants repeated the statements about Denton's investigation, BofI's success in the previous two years (adding that BofI had successfully completed "three mid-cycle examinations, two full annual examinations, multiple Federal Reserve regulatory examinations, and received regulatory non-objection in the last six months to launch a refund advance product with H&R Block"), and BofI's strong regulatory standing with no enforcement actions.  (*Id.* ¶ 88.)

In the March 31, 2017 *New York Post* article, Bar-Adon denied "that there were

any material investigations that were required to be disclosed." (*Id.* ¶ 93.)  The same day the article was published, BofI issued a press release stating that the article was "nothing more than a rehash of baseless allegations that first surfaced over two years ago, and have been soundly refuted by BofI in court filings and on conference calls." (*Id.* ¶ 94.)  The release denied the article's assertion that BofI was under a federal money laundering probe, stating that it "has received no indication of, and has no knowledge regarding, such purported money laundering investigation." (*Id.*)  The release then repeated Garrabrants's earlier statements regarding BofI's success in the previous two years, its completion of regulatory examinations, and its strong regulatory standing with no enforcement actions. (*Id.*)  It further stated that BofI "is regularly examined by its federal regulators," and repeated Garrabrants's prior statements about Denton's investigation. (*Id.*)

On June 28, 2017, BofI's public relations counsel and spokesman repeated the previous assertion that there were "no material investigations that would require public disclosure and BofI remains in good regulatory standing." (*Id.* ¶ 98.)

During a July 27, 2017 earnings conference call, Garrabrants stated that that BofI had received confirmation from the SEC "that no investigation is ongoing and no enforcement actions is contemplated against BofI." (*Id.* ¶ 99.)

### D. Falsity

According to the CAC, the statements discussed in the preceding section constituted material misrepresentations because (1) they failed to disclose that there were ongoing SEC, DOJ, and FDIC investigations into BofI and Garrabrants; (2) they failed to disclose that there was "a second whistleblower," presumably referring to Golub; (3) they failed to disclose that "a material portion of the Company's earnings were derived from loans made directly or indirectly to criminals," and (4) the failure to disclose the ongoing regulatory investigations amounted to a breach of the code of ethics, which itself must have been disclosed. (*Id.* ¶¶ 72, 79, 85, 89, 104.)

//

## II.    Legal Standard

A Rule 12(b)(6) motion attacks the complaint as not containing sufficient factual allegations to state a claim for relief.  "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  While "detailed factual allegations" are unnecessary, the complaint must allege more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements."  *Iqbal*, 556 U.S. at 678.  "In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief."  *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).

A claim of securities fraud must satisfy the dual pleading requirements of Rule 9(b) and the PSLRA.  Rule 9(b) requires the complaint to state with particularity the circumstances constituting fraud.  Satisfaction of this heightened standard requires delineating "the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation."  *Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007) (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1400 (9th Cir. 1986)).  The complaint must also indicate "what is false or misleading about a statement, and why it is false," and "be specific enough to give defendants notice of the particular misconduct that they can defend against the charge and not just deny that they have done nothing wrong."  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (quoting *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001)).  In the Ninth Circuit, Rule 9(b)'s heightened pleading standard applies to all element of a securities fraud claim, including loss causation.  *Or. Pub. Empls. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014) ("*Apollo*").

The PSLRA requires that a securities fraud complaint "plead with particularity both falsity and scienter" by specifying "each statement alleged to have been misleading,

the reason or reasons why the statement is misleading." *Id.* at 990–91 (quoting *Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir. 2002)).

### III. Discussion

#### A. Section 10(b) Claims

To show that Defendants violated Rule 10b-5, Plaintiffs must demonstrate: (1) "a material misrepresentation or omission by the defendant," (2) scienter," (3) "a connection between the misrepresentation or omission and the purchase or sale of a security," (4) "reliance upon the misrepresentation or omission," (5) "economic loss," and (6) "loss causation." *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1274 (9th Cir. 2017) ("*Hewlett-Packard*") (quoting *Matrixx Initiatives v. Siracusano*, 563 U.S. 27, 37–38 (2011)).

##### i. Non-Actionable Statements

For purposes of a securities fraud claim, a "statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Hewlett-Packard*, 845 F.3d at 1275 (quoting *Berson v. Applies Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008)). "To be misleading, a statement must be 'capable of objective verification.' For example, 'puffing'—expressing an opinion rather than a knowingly false statement of fact—is not misleading." *Id.* (quoting *Apollo*, 774 F.3d at 606)).

###### a. SEC Filings

The Court looks first to the statement in BofI's March 14, 2016 Form 8-K, which asserted that the Audit Committee engaged Dentons to investigate Erhart's accusations against BofI, and that Dentons concluded that those accusations lacked merit. (CAC ¶ 64.) Nothing in the CAC suggests that this statement is misleading: there are no allegations in the CAC suggesting that Dentons did not investigate Erhart's claims, or that Dentons did not reach the conclusion suggested in the statement.

Next are the statements in the Form 10-Qs setting forth BofI's financial and operating results for each quarter. (CAC ¶¶ 66, 75, 82, 86, 95, 100.) There can be no

3:17-cv-00667-GPC-KSC

question that these statements are objectively verifiable.  The CAC does not explain, however, how these statements were misleading.  The allegation that comes the closest to explaining the falsity of BofI's financial statements is the repeated assertion that "BofI failed to disclose that a material portion of the Company's earnings were derived from loans made directly or indirectly to criminals."  (*Id.* ¶¶ 72, 79, 85, 89, 97.)  But Plaintiffs offer no reason to believe that the contents of BofI's financial and operating results gave the impression that it was not lending to "criminals."[4]

### b. Conference Calls and Press Releases

Most of the statements made in BofI's conference calls and press releases are also not actionable.  Some, however, might meet the applicable pleading standard for falsity.  Because—as the following section explains—the CAC fails to plead adequate loss causation for those closer statements, for the purposes of this ruling the Court assumes that those statements are actionable.  In this section, the Court separates the non-actionable statements from those that might meet the applicable heightened pleading standard.

In its April 18, 2016 press release, BofI stated that there was an "absence of public enforcement actions."  (CAC ¶ 65.)  Nothing in the CAC suggests that the statement was misleading.  There may have been ongoing regulatory investigations, and BofI officials may have known about those investigations; but no allegations suggest that there was any public enforcement action against BofI at the time of this statement.

The same press release also asserted that Erhart's allegations were

---

[4] The Court notes that in Plaintiffs' opposition memorandum, they clarify that the CAC's discussion of BofI's Code of Ethics and Statement of Ethical Principles should not be construed as an assertion that the statements included in those documents are false or misleading.  Rather, Plaintiffs rely on these documents to support their allegations of scienter.  (*See* ECF No. 34 at 24.)  To be sure, the Court agrees with Defendants that the statements in the Code of Ethics and Statement of Ethical Principles are not actionable because they are aspirational in nature and are not objectively verifiable.  *Hewlett-Packard*, 845 F.3d at 1276 (explaining that holding aspirational statements in a code of ethics to be actionable would be "simply untenable, as it could turn all corporate wrongdoing into securities fraud").

"disconnected . . . from the reality of BofI's highly compliant and top-performing business." (*Id.*) Assuming the truth of Erhart's claim that BofI was indeed lending to "criminals," this statement was false. In the next section, the Court considers whether there are sufficient allegations of loss causation relevant to this statement.

In the April 28, 2016 earnings conference call, Garrabrants stated that BofI was "in a strong regulatory standing." (*Id.* ¶ 71.) This assertion was repeated multiple times in later statements. (*Id.* ¶¶ 73, 84, 88, 94.) This statement is too vague to be actionable. Courts have found similar language too vague to be actionable. *See, e.g.*, *In re Calpine Corp. Secs. Litig.*, 288 F. Supp. 2d 1054, 1088 (N.D. Cal. 2003) ("[T]he operative words that Plaintiff assail in the various statements are 'strong,' 'healthy,' and 'solid.' This Court has previously found such words to be far too vague to be actionable under the PSLRA." (citations omitted)).

Also made during the April 28 earnings conference call—and many others (*id.* ¶¶ 73, 84, 88, 94)—were assertions that BofI had "no enforcement actions, has not been fined a single dollar by any regulatory agency and has not been required to modify its products or business practices." (*Id.* ¶ 71.) Nothing in the CAC suggests that these assertions are false or misleading: there are no allegations that BofI was the subject of any enforcement action, had been fined, or had been required by regulators to alter any of the bank's practices.

Next, Garrabrants's assertion during the August 2 conference call that "one of the world's largest law firms" conducted an investigation into Erhart's allegations and found no wrongdoing was not misleading. (*Id.* ¶ 73.) There are no allegations in the CAC suggesting that Dentons did not conduct an investigation into Erhart's allegations, or that its conclusion was anything other than that there was no factual basis behind Erhart's allegations. Nor are there any allegations that BofI had not just "completed two record-setting fiscal years," "closed two acquisitions" that required regulatory approval, or "successfully completed multiple OCC and Federal Reserve Regulatory examinations." (*Id.*; *see also id.* ¶¶ 84, 94 (making same assertions).)

Perhaps the assertion that Plaintiffs rely upon most heavily is Garrabrants's assertion during the same call that there has been no "event" with regulators "that would require disclosure," and that BofI had "not been asked any question or received any inquiry from any agency, including the SEC that would suggest concerns regarding financial misrepresentation, financial results, estimates, or other matter that would require an 8-K." (*Id.*) He followed up that statement with the same assertion: "[S]o allow me to repeat. We have not been asked any questions that or received any inquiry that would suggest any concerns about our financials, financial misrepresentations, financial results estimates or anything else that would require the filing of an 8-K, meaning that would be material." (*Id.*) Before considering whether this assertion was actionable, the Court finds it important to clarify that, based on a review of the entire statement, Garrabrants did not deny that BofI was in contact with regulators.[5] To the contrary, he stated that BofI was in "constant dialogue with regulators, including the OCC, SEC, FDIC, and the Fed." (*Id.*) The issue here is whether it was false or misleading for Garrabrants to say that in the course of that dialogue with regulators, BofI was informed that the SEC investigation had reached a point that triggered a duty to disclose such inquiries to BofI investors by way of a Form 8-K. Plaintiffs have not offered—either in the CAC or their memorandum—any reason why that was the case. For that reason, they fail to allege that these statements were misleading.

Rather than offer such an explanation, Plaintiffs cite to several cases in which courts have found a failure to disclose regulatory investigations was a material misrepresentation. The Court finds these cases distinguishable. In *No. 84 Employer-Teamster Joint Council Pen. Trust Fund v. America West Holding Corp.*, 320 F.3d 920,

---

[5] On multiple occasions, Plaintiffs take portions of Garrabrants's statement out of context: "BofI told investors they had not received 'any inquiry from any agency' ([CAC] ¶ 73), but BofI was in receipt of subpoenas from the SEC and knew about the DOJ investigation. (ECF No. 34 at 15; *see also id.* at 18 ("Defendants stated that BofI had not received an inquiry from the SEC, when in fact it had.").) This assertion mischaracterizes the statement: Garrabrants said that despite being in constant dialogue with regulators, BofI had not received any inquiry from an agency *that would require BofI to file a Form 8-K.*

935 (9th Cir. 2003), the court held that the failure to disclose the existence of an FAA investigation into the company amounted to a material misrepresentation. But there, the FAA had sent warning letters to the company indicating that the FAA had already determined that the company was out of compliance and threatened to bring enforcement actions, which led the company to engage in "secret settlement negotiations." *Id.* at 928; *see id.* at 926 ("[T]he FAA continued to conduct inspections, find violations, and issue warnings to America West regarding its maintenance operations."). The factual context of this case is much different: the CAC does not suggest that BofI had, by the time Garrabrants made these statements, received any suggestion that the SEC had determined BofI to be in violation of any law or regulation.

While Plaintiffs are correct that *Menaldi v. Och-Ziff Capital Management Group LLC*, 164 F. Supp. 3d 568 (S.D.N.Y. 2016), comes close to the facts of this case, the Court finds it distinguishable. There, defendants failed to disclose that the company had received subpoenas from the SEC and requests for information from the DOJ. *Id.* at 574–75. In the statements at issue, the company asserted that to the extent that any regulatory investigations were ongoing, they would not have a material impact on its business. *Id.* at 584. The court found that this assertion was misleading. *Id.* But in reaching that conclusion, the court relied on the fact that the company later admitted that the investigation "could" have a material effect on its business. *Id.* That later assertion served as evidence that the earlier assertion—that the investigations would not have a material impact—was false. Here, there is no analogous allegation suggesting that Garrabrants's conclusion—that the SEC's investigation did not need to be disclosed in the form of an 8-K—was incorrect.

*In re BioScrip, Inc. Securities Litigation*, 95 F. Supp. 3d 711, 725–27 (S.D.N.Y. 2015), offers a similar factual pattern. There, the court found to be misleading statements by a company—which had received a "civil investigative demand" from the DOJ—that "[f]rom time to time" the company would receive subpoenas and requests from governmental agencies and that "[t]here can be no assurance that we will not receive

subpoenas or be requested to produce documents." *Id.* at 725–26. The court explained that these statements, even if literally true, were misleading because "the inference is available that a reasonable investor could have read them to mean that [the company] was not already in receipt of just such a request for information." *Id.* at 727. In other words, the court said, the statement that the company *may* receive subpoenas, without noting that it had just received such a subpoena, could have been seen as "assuring the investor that no such threat existed at that precise moment." *Id.* Unlike the statements at issue in *BioScrip*, a reasonable investor hearing Garrabrants's statement would not get the impression that BofI had not received inquiries from its regulators. To the contrary, as stated above, Garrabrants stated that BofI was in "constant dialogue with regulators." (CAC ¶ 73.) The only way that a reasonable investor could be misled by Garrabrants's statement would have been if BofI's receipt of the SEC's subpoena required BofI to file a Form 8-K. Without the benefit of any argument from Plaintiffs that that was the case, the Court cannot agree that these statements were misleading.[6]

Next is Garrabrants's statement during the October 27, 2016 earnings conference call denying that BofI had any "interest credit exposure ownership of any loan" to Galanis or "any loan to Galanis who is a guarantor," including the $7 million loan referenced in the article. (CAC ¶ 84.) The only allegation in the CAC that calls this assertion into question is the contents *Seeking Alpha* article itself. The Court assumes that the contents of the *Seeking Alpha* article creates a reasonable inference that BofI did, in fact, lend money to Galanis. Whether or not the CAC alleges that this statement caused Plaintiffs harm, however, is a different issue that the Court addresses separately below.

Garrabrants's statements during the January 31, 2017 conference call repeated

---

[6] It may well be the case that BofI was under a duty to disclose its receipt of the subpoena; but surely it "is not this court's responsibility to research and construct the parties' arguments." *APS Sports Collectibles, Inc. v. Sports Time, Inc.*, 299 F.3d 624, 631 (7th Cir. 2002) (quoting *Spath v. Hayes Wheels Int'l-Indiana, Inc.*, 211 F.3d 392, 397 (7th Cir. 2000)).

many of the assertions already discussed and determined not to be actionable. The only new assertions made during this conference call was that BofI had successfully completed "three mid-cycle examinations, two full annual examinations, multiple Federal Reserve regulatory examinations, and received regulatory non-objection in the last six months to launch a refund advance product with H&R Block." (*Id.* ¶ 88.) Nothing in the CAC suggests that any of these assertions were in any way untrue.

Next, the CAC points to Bar-Adon's denial in the March 31, 2017 *New York Post* article that there were any material investigations that were required to be disclosed. (*Id.* ¶ 93.) As explained above, Plaintiffs have not offered any reason to believe that the SEC's investigation needed to be disclosed.

In response to the March 31 *New York Post* article, BofI issued a press release saying that it "has received no indication of, and has no knowledge regarding, such purported money laundering investigation." (*Id.* ¶ 94.) The CAC sufficiently demonstrates that this statement was false. According to the October 25 *New York Post* article, SEC documents revealed by *Probes Reporter* via FOIA requests indicated that the SEC was investigating BofI as reported in the March 31 article. (ECF No. 32-9.) In light of CW2's statement that there was "no way" BofI officials could not have known about the ongoing regulatory investigations (CAC ¶ 58), the assertion that BofI was not aware of the SEC investigation was false. In the following section, the Court considers whether the CAC offers sufficient allegations of loss causation.

The next statement discussed in the CAC is the June 28, 2017 statement by BofI's public relations counsel and spokesman that there were "no material investigations that would require public disclosure and BofI remains in good regulatory standing." (*Id.* ¶ 98.) As discussed above, the first aspect of that statement—regarding investigations that required disclosure—is not actionable because Plaintiffs offer no reason why any of the referenced investigations needed to be disclosed. Also as discussed above, the second assertion—that BofI had "good" regulatory standing—is too vague to be actionable.

The last statement referenced in the CAC is the July 27, 2017 earnings conference

call announcement that the SEC had indicated to BofI that no further investigation was ongoing "and no enforcement actions [were] contemplated against BofI." (*Id.* ¶ 99.) The CAC also alleges, however, that the SEC sent BofI a letter dated June 28, 2017, indicating that it had concluded its investigation into BofI, and that as of that date, the SEC did not "intend to recommend any enforcement action by the Commission." (*Id.* ¶ 119.) In light of that letter, the statement made during the July 27 earnings conference call was true.

### ii. Loss Causation

In light of the analysis above, the remaining statements to consider are (1) the April 18, 2016 statement that Erhart's allegations were "disconnected from reality" (*id.* ¶ 65), (2) the October 27, 2016 statement that BofI had not made any loans to Galanis (*id.* ¶ 84), and (3) the March 31, 2017 statement that there were no investigations into BofI regarding potential money laundering. The CAC fails to state a claim as to these statements because there are insufficient allegations of loss causation.

Loss causation is a "basic" element of a claim of a Rule 10b-5 violation. *Dura Pharms., Inc. v. Bruodo*, 544 U.S. 336, 341–42 (2005). To plead loss causation, a plaintiff "must plausibly allege that the defendant's fraud was *revealed* to the market and *caused* the resulting losses." *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014) (internal quotation marks omitted). As indicated above, this must be pled with particularity. *Apollo*, 774 F.3d at 605. "The misrepresentation need not be the sole reason for the decline in value of the securities, but it must be a substantial cause." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks omitted).

To prove loss causation, Plaintiffs point to "corrective disclosures" of the alleged misrepresentations referenced in the CAC. "While a corrective disclosure need not be an outright admission of fraud to survive a motion to dismiss, the disclosure of a mere risk or potential for fraud . . . is insufficient to establish loss causation." *In re BofI Holding, Inc.*, No. 3:15-cv-02324-GPC-KSC, 2018 WL 1410729, at *3 (S.D. Cal. Mar. 21, 2018)

(internal quotations omitted). A "corrective disclosure must be relevant to the alleged misrepresentation at issue; it must 'relate back to the misrepresentation and not to some other negative information about the company.'" *Id.* (quoting *Bonnano v. Cellular Biomedicine Grp., Inc.*, No. 3:15-cv-01795-WHO, 2016 WL 4585753, *3 (N.D. Cal. Sept. 2, 2016)).

### a. Assertion Regarding Erhart's Accusations

The Court first considers the statement that Erhart's allegations were disconnected from reality. (CAC ¶ 65.) Plaintiffs assert that this statement is misleading because, taking Erhart's accusations as true, BofI did engage in lending to "criminals." According to Plaintiffs, this statement was revealed to be false through the *Seeking Alpha* article discussing BofI's loans to Galanis. (ECF No. 34 at 26–27.) Defendants contend that this article cannot serve as a corrective disclosure because it relied on public information. The Court agrees.

"As the term suggests, a corrective disclosure normally must reveal some piece of previously undisclosed information showing the falsity of the misrepresentation. If the alleged disclosure is duplicative of public information, the market will already have incorporated that information into the stock price; thus, the repeated discussion of the same information normally will not cause any later stock price decrease." *BofI*, 2018 WL 1410729, at *4 (citations omitted); *see also Bonnano*, 2016 WL 4585753, *5 ("summary and comments on publicly available facts" will not serve as a corrective disclosure "because an efficient market would easily digest all public information without the need for [the author of the summary and comment] to regurgitate it first" (internal quotation marks omitted)); *In re Novatel Wireless Secs. Litig.*, 830 F. Supp. 2d 996, 1019 (S.D. Cal. 2011) ("It stands to reason then that [a] disclosure that does not reveal anything new to the market is, by definition, not corrective." (citations omitted)); *In re Maxim Integrated Prods., Inc. Secs. Litig.*, 639 F. Supp. 2d 1038, 1048 (N.D. Cal. 2009) ("[A] disclosure that does not reveal anything new to the market is, by definition, not corrective." (internal quotation marks omitted)). The *Seeking Alpha* article states clearly that it is based on

publicly available information. (ECF No. 32-8 at 18 ("All information for this article was derived from publicly available information.").)

Plaintiffs concede that the information relied upon by the author of the *Seeking Alpha* article was already public. They nonetheless argue that the analysis provided by the author constituted a corrective disclosure. "Repeated discussion of already public information *may* serve as a corrective disclosure . . . when it brings to light an implication of which the market was not aware because understanding that implication required some technical or scientific expertise. For example, a discussion of public information may be adequate to serve as loss causation if it interprets 'complex economic data understandable only through expert analysis [that was not previously] readily digestible by the marketplace.'" *BofI*, 2018 WL 1410729, at *4 (quoting *Pub. Empls. Ret. Sys. of Miss., Puerto Rico Teachers Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 323 (5th Cir. 2014) ("*Amedisys*")). Plaintiffs offer no persuasive reason, however, why the market would not have been able to identify a connection between BofI and Galanis based on the information relied upon by the author of the *Seeking Alpha* article. They assert, conclusively, that "the author goes through a specialized analysis connecting integral information to come to the conclusion that BofI was connected with Galanis." (ECF No. 34 at 27.) This assertion simply begs the question: what analysis did the author perform and why could the efficient market not reach the same conclusion?

There is no indication that the author of the *Seeking Alpha* article engaged in any kind of specialized analysis. Rather, the article identifies a potential connection between BofI and Galanis by piecing together names on different public filings. (*See generally* ECF No. 32-8.) The fact that retrieving these pieces of information might have required a long time or many resources, however, does nothing to rebut the presumption that the market would have already internalized them. *See Bonanno*, 2016 WL 4585753, at *5 ("Under an efficient market theory, it is not necessary for any specific individual to track down any piece of information on every stock. One presumes that all public information is incorporated into the market price no matter how far flung it may be.").

The Court also notes that the *Seeking Alpha* article itself characterizes its own conclusion as tenuous: "My research leads me to believe that a reasonable person could infer that Galanis has a relationship with BofI that remains undisclosed to this date." (ECF No. 32-8 at 5.)  In other words, the author of the article suggests that the connection between BofI and Galanis is far from a sure thing; rather, the author merely contends that a reasonable person could *infer* such a connection.  At best, this amounts to a mere risk or potential for fraud, which "is insufficient to establish loss causation."  *Loos v. Immersion Corp.*, 762 F.3d 880, 889 (9th Cir. 2014).

### b.  Denial of Connection to Galanis

Next, the Court considers Garrabrants's statement during the October 27, 2016 earnings conference call denying that BofI had made any loan to Galanis.  (CAC ¶ 84.)  Assuming that this statement was false—that is, assuming that BofI had made a loan to Galanis prior to this statement—there is no allegation that a corrective disclosure of the falsity of this statement was made thereafter.  The only public disclosure of fact that calls this statement into question is the *Seeking Alpha* article itself, which was published prior to this statement.  To demonstrate that the statement caused Plaintiffs any harm, Plaintiffs must allege that a corrective disclosure of the falsity of that statement occurred *after* the statement was made.  In the absence of such allegation, Plaintiffs fail to show how this statement harmed them.

### c.  Denial of Money Laundering Investigation

Finally, the Court considers the potentially misleading press release made after the March 31, 2017 *New York Post* article.  The *New York Post* article stated that federal agents "are conducting a probe into possible money laundering" based on regulatory filings made by BofI to the OCC, and that while Justice Department was "leading the investigation," the SEC and Treasury Department were "also in the probe."  (ECF No. 32-7.)  The same day the article was published, BofI issued a press release that stated it "has received no indication of, and has no knowledge regarding, such purported money laundering investigation."  (*Id.* ¶ 94.)  The corrective disclosure identified by Plaintiffs is

the October 25, 2017 *New York Post* article stating that BofI had been under a 16-month SEC investigation.[7]  (ECF No. 34 at 28.)  The entirety of the article is the following:

> Online lender Bank of Internet was the subject of a formal 16-month [SEC] investigation, according to a report.

> The company, led by [Garrabrants], was the subject of scrutiny until June – when it ceased without the SEC taking any action.

> The probe was focused on alleged conflicts of interest, auditing practices, and loans made to two entities, according to subpoenas and government documents obtained by Probes Reporter, a publisher of investment research.

> The documents, obtained through the Freedom of Information Act, confirmed two earlier reports by The Post that the bank was under investigation.

> In April, The Post first reported that the Justice Department, the SEC, the [FDIC], and the US Treasury's Office of the Inspector General were investigating the bank, citing public documents obtained in an unrelated case.

> At the time, Eshel Bar-Adon, the banks' chief legal officer, said, "There are no material investigations that would require public disclosure and BofI remains in good regulatory standing."

> But Probes Reporter countered: "After reviewing the documents from BofI's SEC probe, it strains credibility to imagine investors would not consider this investigation material and in need of disclosure."

(ECF No. 32-9.)

Defendants argue that the October 25 article did not disclose any previously nonpublic information.  The Court agrees.  As discussed above, a corrective disclosure must reveal information to the market that was not otherwise publicly available.  The efficient market theory, upon which Plaintiffs rely,[8] "is premised on the understanding

---

[7] In a brief footnote, Plaintiffs suggest that the April 6, 2017 *New York Post* article also "revealed additional details of government investigations."  (ECF No. 34 at 28 n.22.)  Plaintiffs do not explain what those "additional details" were, or how they are relevant to the alleged misrepresentation in BofI's March 31 press release.

[8] While the CAC also states that Plaintiffs alternatively invoke the presumption of reliance discussed in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), that presumption applies to omissions in the face of a duty to disclose.  With respect to the statement at issue here,

that in an efficient market, all publicly available information is rapidly incorporated into, and thus transmitted to investors through, the market price." *Amgen Inv. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013). "The efficient market theory, however, is a Delphic sword: it cuts both ways." *Meyer v. Greene*, 710 F.3d 1189, 1198 (11th Cir. 2013). To the extent that the information pointed to by Plaintiffs was publicly available prior to the date of the alleged corrective disclosure, that alleged disclosure would have been merely "confirmatory" because the market would have already incorporated the information into the price. *Id.* at 1197–98. If that is the case, the alleged misrepresentation was not the cause of Plaintiffs' loss. *Id.*

Because Plaintiffs rely on the fraud-on-the-market theory, the Court must assume that all available information—"no matter how far flung it may be"—had already been incorporated into the market price by the time the *New York Post* published its October 25 article. *Bonanno*, 2016 WL 4585753, at *6. That article states that *Probes Reporter* obtained its information through a FOIA request. (*Id.* ("The documents, obtained through the Freedom of Information Act, confirmed two earlier reports by The Post that the bank was under investigation.").) The Court must therefore answer the following question: is information available from a federal agency through FOIA "publicly available"? As this Court explained in a separate securities fraud action against the same Defendants, it is.[9] *BofI*, 2018 WL 1410729, at *13. The efficient market theory

---

Plaintiffs allege that it was actionable not because it omitted certain facts, but instead because the statement was flat-out false.

[9] The Court is not aware of other cases addressing this specific issue. It came up briefly in *Meyer*, in which the court rejected the plaintiffs' argument that the relevant information was not previously publicly available because some of it "came from Freedom of Information Act requests." 710 F.3d at 1198 n.9. But the court avoided the issue: it explained that even assuming that the FOIA (and other) information was not "publicly available" for purposes of loss causation, that information was irrelevant to the statements at issue in that case and therefore could not have supported a corrective disclosure. *Id.* A few sentences later, the court also made mention of "county property appraiser's sales lists," and concluded that such information was publicly available. *Id.* To the extent that those lists were the information that was obtained through FOIA—the discussion on this point is a bit unclear—then *Meyer* fully supports the Court's decision here.

presumes that interested, "information-hungry" market participants are actively and continuously trading a company's stock. *Basic Inc. v. Levinson*, 485 U.S. 224, 249 n.29 (1988). One obvious source of information about a particular company is its regulator, particularly when—as we have here—the company has denied the existence of a regulatory investigation in response to reports stating the contrary. The Court must assume that, in the nearly seven months between BofI's denial and the October 25 article, a market participant would have made the sensible step of asking the SEC whether BofI's denial was accurate. The fact that a market participant would have had to jump through a bureaucratic hoop to obtain this information does not mean that the information was not "public." To the contrary, the Court must assume that "information-hungry" market participants seeking an edge in trading BofI's stock would expend at least some effort to obtain material information about the company. The Court's understanding of an efficient market's collective reach, in other words, cannot be limited to information one can find on Google.

In response to this assertion Plaintiffs contend that "[w]hile it may have been possible (in theory) for investors to submit FOIA requests, they were under no obligation to do so and were completely justified in relying on BofI's public representations." (ECF No. 34 at 22.) But whether other market participants were likely to rely on BofI's statements is not the focus of this analysis. What matters is whether other investors, seeking information about BofI, would reasonably have been able to obtain this information. That is the case here. "A FOIA request for a copy of U.S. Securities & Exchange Commission (SEC) records can be made by *any individual*, private organization, or public organization, other than another Federal agency." U.S. Secs. & Exch. Comm'n, *How to Make a Freedom of Information Act (FOIA) or Privacy Act Request*, https://www.sec.gov/foia/howfo2.htm (last visited June 18, 2018) (emphasis added); *see also* 5 U.S.C. § 552(a)(3)(A) ("Except with respect to [mandatory agency disclosures], and except as provided in subparagraph (E) [relating to requests from government entities and their representatives], each agency, upon any request for records

which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available *to any person*." (emphasis added)); 17 C.F.R. § 200.80(a)(4) (upon a proper records request, the SEC "shall make the records promptly available to *any person*" (emphasis added)). Plaintiffs offer no reason to believe that if a market participant made a FOIA request for information about the SEC's investigation prior to October 25, 2017, that participant would not have received the same information obtained by *Probes Reporter* and published in the *New York Post*.

To accept Plaintiffs' argument would be to turn the efficient market theory on its head. Plaintiffs "cannot contend that the market is efficient for purposes of reliance and then cast the theory aside when it no longer suits their needs for purposes of loss causation." *Meyer*, 710 F.3d at 1198. In other words, "[a]n efficient market for good news [must also be] an efficient market for bad news." *In re Merck & Co., Inc. Secs. Litig.*, 432 F.3d 261, 271 (3d Cir. 2005). Having been offered no reason to believe that any other market participant could not have made a FOIA request from the SEC about BofI prior to October 25, the Court must assume that he or she did. The CAC therefore fails to allege with particularity a revelation of the falsity of BofI's March 31 statement.

### B. Section 20(a)

Plaintiffs concede that their Section 20(a) claims are derivative of their Section 10(b) claims. (ECF No. 34 at 30.) Because the Court has concluded that the CAC fails to state a claim for violation of Section 10(b), it also fails to state a claim for violation of Section 20(a).

### IV. Sanctions

Defendants ask the Court to enter sanctions against Plaintiffs because, according to Defendants, this suit is a "copy-cat" case based on the earlier-filed securities fraud case against BofI that was recently dismissed. *See In re BofI, Holding Inc. Secs. Litig.*, No. 3:15-cv-02324-GPC-KSC (S.D. Cal.).

Sanctions are not appropriate in this case. The CAC alleges claims based on facts

that differ from those alleged in the earlier-filed securities fraud case. Moreover, the CAC's claims are far from frivolous. As noted below, amendment to the CAC may cure the deficiencies discussed in this ruling. The Court therefore DENIES Defendants' motion for sanctions.

## V. Conclusion

For the reasons explained above, the Court concludes that the CAC fails to state a claim for violation of Section 10(b) or Section 20(a) of the Securities Exchange Act. The Court therefore GRANTS Defendants' motion to dismiss. It is possible that further amendment, however, may cure the deficiencies discussed above. As a result, the Court DISMISSES the CAC without prejudice. Plaintiffs may file an amended complaint within 21 days of the date this order is filed.

**IT IS SO ORDERED.**

Dated: June 19, 2018

Hon. Gonzalo P. Curiel
United States District Judge