**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone: (818) 532-6499
E-mail: jpafiti@pomlaw.com
- *additional counsel on signature page* -

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BAR MANDALEVY, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>BOFI HOLDING, INC., GREGORY GARRABRANTS, ANDREW J. MICHELETTI, ESHEL BAR-ADON and PAUL J. GRINBERG,<br><br>Defendants. | Case No. 17-cv-00667-GPC-KSC<br><br>**CLASS ACTION SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>Hon. Gonzalo P. Curiel<br><br>JURY TRIAL DEMANDED |

Lead Plaintiffs Joseph Shepard and David Grigsby, along with named plaintiff Bar Mandalevy ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' second amended complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted

by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding BofI Holding, Inc. ("BofI" or the "Company"), analysts' reports and advisories about the Company, statements made by confidential witnesses, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired BofI securities between March 14, 2016 and October 24, 2017, both dates inclusive (the "Class Period"). Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2. BofI, short for Bank of Internet, operates as the holding company for BofI Federal Bank (the "Bank"), a consolidated wholly-owned subsidiary of the Company. The Bank provides consumer and business banking products in the United States.

3. Founded in January 1999, the Company is headquartered in San Diego, California. The Company's common stock trades on the NASDAQ under the ticker symbol "BOFI".

4. Throughout the Class Period, BofI misled investors by misrepresenting and omitting material information in their public statements, the disclosure of which would have altered the risk profile of their capital. Two glaring examples of the egregious disclosure practices displayed by BofI are BofI's failure to disclose that: (i) it engaged in lending, directly or indirectly, to criminals; and (ii) it was being investigated by a number of agencies including the SEC, Department of Justice ("DOJ"), Federal Deposit Insurance Corporation ("FDIC"), as well as other agencies. Importantly, Gregory Garrabrants, BofI's Chief Executive Officer ("CEO"), President and Director of the Company, was said to be the focus of the DOJ's investigation along with the Company. There can be little doubt that the disclosure of such omitted facts would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.

5. Prior to the Class Period, the *New York Times* ran an article on August 22, 2015 about BofI entitled "*An Internet Mortgage Provider Reaps the Rewards of Lending Boldly*." The article raised a number of issues about BofI, including that it loaned money to unsavory characters who were later found to have run afoul of the law.

6. Then, in October 2015, Charles Matthew Erhart ("Erhart"), who was a former internal auditor at BofI, filed an action in the Southern District of California under the whistleblower protection provisions of the Sarbanes-Oxley Act and Dodd-Frank Act because he was fired after revealing to federal regulators and management what he believed to be unlawful conduct at the Bank. *Erhart v. BofI Holding, Inc.*, No. 15-cv-02287 (S.D. Cal. 2015). His complaint alleges widespread misconduct, including that BofI failed to disclose loans to criminals and politically exposed persons who put the Bank at risk for violating the Bank Secrecy Act's Anti-Money Laundering Rules (the "Whistleblower Complaint").

7. Throughout the Class Period, Garrabrants misrepresented and made light of these serious allegations during earnings calls and stated that there was no support for Erhart's allegations that the Bank or management engaged in any wrongdoing. The Company made a similar statement in a March 14, 2016 Form 8-K, stating that there was "no support for the conclusions of Mr. Erhart in the Complaint that the Bank or management engaged in wrongdoing or acts of fraud or impropriety."

8. However, on October 26, 2016, *Seeking Alpha* published a blockbuster article entitled "*Barry Minkow? Jason Galanis? Just When I Thought I Had BOFI Figured Out...There's More!*" The article ties BofI to making indirect loans to Jason Galanis, a convicted fraudster. It states that BofI funded a special purpose entity

that Galanis used for financing. The article discusses a series of connections in a $7 million indirect loan made from BofI to Jason Galanis. Specifically, BofI holds the collateral behind the loan that is now delinquent and the subject of messy foreclosure proceedings that involve the DOJ.

9. On this news, BofI's share price fell $3.12 over a two-day decline or 14.53%, to close at $18.36 on October 28, 2016.

10. Defendants also made materially false and misleading statements regarding the existence of investigations into the Company. When the SEC started a "proceeding" against BofI, Defendants had an affirmative duty under Item 103 of Regulation S-K, 17 C.F.R. § 229.103, to disclose the investigation to investors.

11. Further, having opted to speak on the subject of investigations, regulatory standing and the status of various examinations, Defendants were required to speak in an accurate and complete manner. Defendants, however, failed to disclose formal SEC, DOJ and FDIC investigations, including that Defendant Garrabrants was the subject of the DOJ investigation along with the Company. Such investigations also needed to be disclosed because the omission created the impression of a state of affairs that differed in a material way from the one that actually existed at that time. Mainly, that BofI did in fact engage in dangerous business practices where risks were much higher than what was being reported.

12. The truth of these misrepresentations and omissions were revealed over time. The truth first began to be revealed on March 31, 2017, pre-market, when the *New York Post* published an article entitled "Feds probe Bank of Internet for possible money laundering," disclosing that the Company was the subject of a probe led by the DOJ and involving the SEC and the Treasury Department. The article states in relevant part:

**Feds probe Bank of Internet for possible money laundering**

> By Kevin Dugan March 31, 2017 | 1:27am | Updated
>
> Federal agents are conducting a probe into possible money laundering at online lender Bank of Internet, The Post has learned.
>
> The Justice Department, which is leading the investigation, has interviewed at least one former employee of the San Diego-based bank, sources said.
>
> Bank of Internet Chief Executive Gregory Garrabrants, head of the bank since 2007, is also a focus of the probe, sources said. Neither the 18-year-old bank nor Garrabrants has been accused of any criminal activity.
>
> Part of the probe is centered on regulatory filings made by Bank of Internet, also known as BofI, to the Office of the Comptroller of the Currency, according to four people familiar with the matter.
>
> ***
>
> "Greg has answered these questions over and over again, and I don't know why you're all of a sudden coming up with all of this silliness, and in pursuit of what?" Eshel Bar-Adon, BofI's chief legal officer, told The Post.

> Bar-Adon refused to answer questions about any possible criminal probe, but said the company was "completely unaware" of any indictments in the works.
>
> "Due to false allegations made in short seller hit pieces and pending litigation, agencies routinely ask questions to assure themselves that such allegations are without basis," Bar-Adon added in a written statement. "However, there are no material investigations that would require public disclosure and BofI remains in good regulatory standing."
>
> Spokespersons for the Justice Department and OCC, which is also investigating, declined to comment. The Securities and Exchange Commission and the Treasury Department, also in the probe, didn't answer an e-mail seeking comment.
>
> It's not clear whether any of the probes will result in indictments.

13. On this news, BofI's share price fell $1.45 or 5.26%, to close at $26.13 on March 31, 2017.

14. On April 6, 2017, the *New York Post* published a second article entitled "*Feds Probe of Bank of Internet Helped by Aquarium Employee.*" This article disclosed for the first time that the FDIC was involved in the same probe and was conducting its own investigation. The article states:

> **Feds probe of Bank of Internet helped by aquarium employee**
>
> By Kevin Dugan April 6, 2017| 10:26pm | Updated
>
> A federal probe into possible money laundering by a fast-growing online bank got a big assist from an unlikely source: a greedy $10-an-hour part-time aquarium cleaner, court papers reveal.

Michael Procopio, 42, the husband of the bank's former marketing boss, pocketed hundreds of thousands of dollars in bogus consulting fees arranged by his wife.

Kristi Procopio, 43, told her superiors at the Bank of the Internet, or BofI, that her hubby was a consultant needed to complete marketing work….

The couple set up a sham consulting shop and together siphoned $500,000 from BofI….

Michael and Kristi were busted last year on embezzlement charges … and were sentenced … to four years in prison and ordered to repay $525,002.

Meanwhile, Kristi is telling authorities – including the San Diego US Attorney, the Securities and Exchange Commission and the FDIC – what she knows about alleged lax accounting and possible money laundering at BofI, court papers show.

***

BofI executives told the Post they were "completely unaware" of any investigations.

They have denied any wrongdoing….

The scheme was able to go on for so long because the bank had "a poor internal auditing system," the DA's office said.

Justice, the SEC, and Treasury have previously declined to comment on any investigation. The FDIC didn't immediately respond to an e-mail seeking comment on its investigation, which hasn't previously been reported.

***

Eshel Bar-Adon, Bofi's chief legal officer, said, "Ms. Procopio has pursued a vendetta against the bank, and has made numerous false allegations in a class action lawsuit and elsewhere.

> "She is lying again now," Bar-Adon said in a statement to the *New York Post*. "No agency has taken legal or regulatory action as a result of her false allegations, and we do not expect any action will be taken."

15. On this news, BofI's share price fell $.31 or .01%, to close at $24.15 on April 7, 2017.

16. On October 25, 2017, the *New York Post* published a third article entitled "*Bank of Internet Was under 16-month SEC investigation.*" The article disclosed that the Company was indeed the subject of a 16-month *formal* SEC investigation until June 2017. The article was based on a report by *Probes Reporter* that also became widely available to non-subscribers on October 25, 2017.

17. On this news, BofI's share price fell $1.25 or 4.57%, to close at $26.09 on October 26, 2017.

18. These disclosures revealed to investors that despite repeated statements that Erhart's allegations were wrong (and thus BofI did not lend to criminals), and BofI was not the subject of any enforcement actions or investigations, BofI failed to disclose that it engaged in lending, directly or indirectly, to criminals, and that BofI was being investigated by a number of agencies including the SEC, DOJ, and FDIC, as well as other agencies.

19. As a result of Defendants' misrepresentations and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

20. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

21. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

22. Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b). BofI's principal executive offices are located within this Judicial District.

23. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

24. Plaintiffs purchased common shares of BofI at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged

corrective disclosures, or upon the materialization of the risks that had been concealed by Defendants occurred.

25. Defendant BofI is incorporated in Delaware, and the Company's principal executive offices are located at 4350 La Jolla Village Drive, Suite 140, Mailstop 801, San Diego, California 92122. BofI's common stock trades on the NASDAQ under the ticker symbol "BOFI".

26. Defendant Gregory Garrabrants ("Garrabrants") has served at all relevant times as the Company's CEO and President (Principal Executive Officer), and Director. Defendant Garrabrants worked in the San Diego headquarters and, according to Confidential Witness ("CW") 2, who is more fully described herein, was so involved in the day-to-day operations that essentially everyone at BofI reported to him.

27. Defendant Andrew J. Micheletti ("Micheletti") has served at all relevant times as the Company's Executive Vice President and Chief Financial Officer ("CFO") of BofI and the Bank (Principal Financial Officer). Defendant Micheletti worked in the San Diego headquarters and was very involved in the oversight of the Company's finances.

28. Defendant Eshel Bar-Adon ("Bar-Adon") has served at all relevant times as the Chief Legal Officer and Executive Vice President, Specialty Finance of

BofI and the Bank. Defendant Bar-Adon worked in the San Diego headquarters and was intimately involved in all legal and regulatory matters concerning the Company.

29. Defendant Paul J. Grinberg ("Grinberg") has served at all relevant times as a member of the Board of Directors, and as Chairman of the Board of Directors since February 16, 2017. Grinberg served as Chairman of the Audit Committee of the Board of Directors and the Bank until February 2017, and continues to serve on both committees. Defendant Grinberg is also Chairman of the Compensation Committee of the Board of Directors and commencing February 2017, serves as Chairman of the Nominating Committee of the Board of Directors.

30. The Defendants referenced above in ¶¶ 26-29 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

31. BofI operates as the holding company for the Bank, a consolidated subsidiary of the Company. According to the Company's website, "the Bank is a nationwide bank that, among other financial products and services, provides financing for single and multifamily residential properties, small-to-medium size businesses in target sectors, and selected specialty finance receivables. With approximately $8.6 billion in assets, [the Bank] provides consumer and business banking products directly through third-party channels."

32. The Bank runs multiple brands over the Internet, including Bank of Internet USA ("BofI USA"), Bofi Federal Bank-Business, BofI Advisor, Apartment Bank, UFB Direct, Annuitants Federal Bank, NetBank, Bank X, and Virtus Bank. BofI USA is a branchless banking model with online banking products and services that are offered by the Bank.

33. At all times, the officers, directors and employees of BofI agreed to operate by and comply with BofI's Code of Ethics. BofI's Code of Ethics stated in pertinent part:

> **BofI Code of Ethics**
>
> This "Code" shall be known as the Code of Ethics for BofI Holding, Inc. ("Company") and applies to Holding's Chief Executive Officer, Chief Financial Officer, and Chief Accounting Officer, Holding's directors, Holding's other non-employee officers, and any employees Holdings may have in the future (collectively, "Holding's Personnel")….
>
> A. **General Policy Statement**: Holding's Personnel will conduct business in accordance with Company's ethical standards. Holding's Personnel are expected to uphold Company's reputation in the performance of their duties.…
>
> B. **Conflicts of Interest:** Holding's Personnel shall comply with the Master Policy.
>
> C. **Disclosure:** Holding's Personnel are expected to provide to shareholders and financial markets proper disclosure in (i) reports and documents that Holding files with or submits to the Securities Exchange Commission and (ii) in other public communications, if applicable.

> D. **Compliance with Applicable Laws and Regulations:** Holding's Personnel, in the performance of their duties, must comply with Applicable Laws….
>
> E. **Internal Reporting of Code Violations**: Company is committed to establishing procedures that will govern the receipt, review, and treatment of complaints received by Company regarding matters covered by this Code, including, without limitation, accounting, internal accounting controls or accounting matters. Each member of Holding's Personnel shall endeavor to promote compliance with this Code and compliance with the Master Policy. Holding's Personnel shall report violations of this Code to Holding's Chief Executive Officer, unless the report directly involves the Chief Executive Officer, in which case the report may be made to the Chair of the Audit Committee (currently Mr. Paul Grinberg who can be reached by telephone at (858) 309-6904 or by email at Paul.Grinberg@bofi.com). Company will not permit retaliation against any Team Member for reports of breaches of either this Code or the Master Policy, in each case, made in good faith.
>
> F. **Administration of the Code of Ethics**: It is the responsibility of each officer and director of Holding to be familiar with this Code and the Master Policy. Company shall use its good faith efforts to ensure that Holding's Personnel comply with the provisions hereof….

34. The Company's Code of Ethics was of particular interest to shareholders given Erhart's October 2015 Whistleblower Complaint alleging widespread unlawful misconduct at BofI, as well as negative articles in the *New York Times* and in other news articles (discussed below).

**BofI Failed to Disclose Material Information about Its Practice <u>of Making Loans to Criminals and Pending Government Investigations</u>**

35. During the Class Period, BofI investors were misled because BofI misrepresented and failed to disclose material information concerning its practice of making risky loans to criminals and pending government investigations.

**BofI Failed to Disclose Its Practice of Making Risking Loans to Criminals**

36. On August 22, 2015, the *New York Times* ran a pre-Class Period article about BofI entitled "*An Internet Mortgage Provider Reaps the Rewards of Lending Boldly*" (the "August 22, 2015 *New York Times* article"). The article states (emphasis added):

> As the leader of Bank of Internet USA, based in San Diego, Mr. Garrabrants has been issuing big mortgages to high earners whom other lenders might not necessarily welcome with open arms….***The bank has made loans to people who were later found to have run afoul of the law***, and Mr. Garrabrants has had to reassure investors that the bank has good relations with regulators.
>
> ***
>
> [Some investors] contend that the bank is attracting people who simply can't get cheaper loans — borrowers who may be more risky. ***Bank of Internet also makes large mortgages to wealthy foreigners, a practice that requires meticulous controls to comply with federal regulations aimed at stopping money laundering.*** The bank's critics wonder whether its compliance department is up to the task, though Mr. Garrabrants vigorously defended its practices. They also take issue with the bank's funding, contending that the lender is too dependent on customer deposits that could evaporate if turbulence returns to the banking world.
>
> ***
>
> ***Bank of Internet has lent money to some unsavory characters***. For example, in 2012 it issued a $5 million mortgage to Purna Chandra Aramalla…. In 2013, federal law enforcement authorities in New York charged Mr. Aramalla with Medicare and Medicaid fraud. In March, he was sentenced to three years in prison.
>
> In mid-2014, Bank of Internet lent $1.05 million to Frederic Elm . . . . In January, the Securities and Exchange Commission accused Mr. Elm of running a "Ponzi-like" scheme that had raised $17 million since November 2013….

> And in 2012, Bank of Internet issued a $1.26 million mortgage to Deepal Wannakuwatte, … who received a 20-year prison sentence last year for operating, for more than 10 years, what the F.B.I. called a Ponzi scheme.
>
> ***
>
> Bank of Internet has lent to people who have failed to pay loans made by other banks. For instance, last year it made a $4.8 million mortgage on a home in Coral Gables, Fla., that belongs to John H. Ruiz, a prominent Miami lawyer. SunTrust, a large regional bank, is currently suing Mr. Ruiz and his wife, asserting that they failed to make payments on a nearly $3 million promissory note.
>
> ***
>
> ***Then there are questions about Bank of Internet's marketing of itself as a lender to "foreign nationals." It does not disclose exactly what proportion of its loans are made to foreigners. When asked, Mr. Garrabrants said it was "nowhere near the majority." Banks that do this sort of lending can expect extra scrutiny from federal regulatory agencies, which have punished banks for not properly applying bank secrecy and anti-money-laundering laws when vetting their international customers.***
>
> In recent months there has been unrest in the division of Bank of Internet that deals with regulatory compliance. Earlier this year, a senior internal auditor, Jonathan Ball, and another employee in the division, Matt Erhart, left the bank. Mr. Ball did not respond to requests for comment. Mr. Erhart's lawyer, Carol L. Gillam, said that she had communicated with regulators, including the Office of the Comptroller of the Currency, the bank's primary regulator. She declined to provide details.
>
> Regulators have not publicly warned or penalized the bank for its lending to foreign nationals, and Mr. Garrabrants often sounds exasperated when defending that business. In his view, short-sellers had sought to stir up concerns about those loans….

37. Erhart, referred to in the August 22, 2015 *New York Times* article, was a former internal auditor at BofI who uncovered widespread misconduct. In October

2015, Erhart filed an action in the Southern District of California under the whistleblower protection provisions of the Sarbanes-Oxley Act and Dodd-Frank Act because he was fired after revealing to federal regulators and management what he believed to be wrongdoing at the Bank. *Erhart v. BofI Holding, Inc.*, No. 15-cv-02287 (S.D. Cal. 2015). His Whistleblower Complaint alleges, *inter alia* – (i) management may be altering Company financials; (ii) BofI falsely responded to an SEC subpoena requesting customer account information (not to be confused with a later formal SEC investigation that began in February 2016 discussed below); (iii) BofI falsely responded to the Office of the Comptroller of the Currency's ("OCC") request for information on bank accounts without tax identification numbers, claiming no such accounts existed; and (iv) ***BofI failed to disclose loans to criminals and politically exposed persons who put the Bank at risk for violating the Bank Secrecy Act's Anti-Money Laundering Rules***.

38. With respect to loans to criminals and politically exposed persons, the Whistleblower Complaint states:

> In or about January 2015, [Erhart] conducted a Loan Origination Audit. He discovered that the Bank was making substantial loans to foreign nationals including Politically Exposed Person (PEP's) in potential violation of BSA/Know Your Customer rules. [Erhart] was able to readily uncover information that many of the borrowers were criminals, even notorious criminals, and other suspicious persons who put the bank at high risk for violating the Bank Secrecy Act's Anti-Money Laundering Rules ("AML Rules") as well as exposing the Bank to reputational risk. The purpose of the AML Rules is to help detect and

report suspicious activity including the predicate acts to money laundering and terrorist financing. The PEP's included very high level foreign officials from major oil-producing countries and war zones.

39. On numerous occasions during the Class Period, Defendants made statements in an effort to discredit Erhart's allegations, including Erhart's allegations that BofI failed to disclose loans to criminals and politically exposed persons. Defendants stated that Dentons US LLP, a law firm hired by the Audit Committee, found Erhart's allegations to be without factual basis.

40. Investors relied on and believed Defendants materially false and misleading statements when deciding to purchase BofI common stock. However, as was later revealed to the market, BofI did in fact make loans, directly or indirectly, to criminals. Having opted to speak on behalf of the Company on the subject of Erhart's Whistleblower Complaint, Defendants did not speak in an accurate and complete manner.

41. Defendants knew that BofI made loans to criminals and that BofI and Garrabrants were being investigated, but made the misleading statements anyway. For example, CW 3 worked in the San Diego headquarters as an Underwriter at the Bank from July 2014 to August 2016. During CW 3's tenure, an investigation by a federal agency was underway, and *CW 3 heard talk of accusations made by regulators that BofI was loaning money to criminals*.

42. On August 3, 2016, in a *Seeking Alpha* article entitled "*Court Filings Reveal Existence of Undisclosed Second Alleged BofI Whistleblower*", it was reported that "[p]ublicly available court filings from February-April 2016 show that BOFI took specific legal steps to conceal details regarding a second 'whistleblower' from the public court system."

43. According to filings in *BofI Federal Bank v. Golub*, No. 37-2016-00004902 (San Diego Co. Ct. 2016), "BOFI anticipated that the individual, a former Assistant Vice President with significant experience, was going to use BOFI information to 'assist in government investigations.'" The Bank moved to enjoin the action and compel arbitration, and the motion was granted in April 2016. The article includes an excerpt from a BofI declaration stating that Veronica Golub, the second whistleblower, "was a quality assurance auditor at BofI. In this position, Golub was responsible for performing quality control on single-family loans originated by BofI. The quality control function assigned to Golub involved identifying, documenting and reporting perceived underwriting deficiencies that potentially impact the credit decision or could affect the salability of a loan...." The article further states (emphasis in original): "The second whistleblower worked in single family mortgage audit (*BOFI's questionable and wide-spread single family mortgages have been referenced in the past in the New York Times as well as in*

*various blog posts, including a December 2014 Seeking Alpha blog post that first provided detail on BOFI's lending practices*)."

44. The article states: "This revelation shatters BOFI's prior intimations that its whistleblower activity was confined to only one 'rogue' and 'junior' employee." "The undisclosed second whistleblower casts significant doubt on both the Audit Committee and Dentons's investigations [of Erhart's whistleblower claims], neither of which ever addressed this second whistleblower."

45. On October 26, 2016, *Seeking Alpha* published a blockbuster article entitled "*Barry Minkow? Jason Galanis? Just When I Thought I Had BOFI Figured Out... There's More!*" The article ties BofI to making indirect loans to Jason Galanis, a convicted fraudster, and the DOJ is involved. It states that BofI funded a special purpose entity that Galanis used for financing (emphasis added):

> In this report, I … show a series of connections in a $7 million loan to Jason Galanis (now delinquent and the subject of messy foreclosure proceedings that involve the Department of Justice). Investors ought to ask/wonder how this loan is being reflected on BOFI's balance sheet and/or if management will speak to said Galanis ties during the next earnings call.
>
> ***
>
> Knightbrook Insurance is controlled by one of BOFI's largest shareholders. Knightbrook made a very odd preferred investment . . . into BOFI in November 2012. Knightbrook has a reinsurance relationship with an entity called New Olympia Re that Jason Galanis claimed to control…. Shortly after Knightbrook invested in BofI shares, an alleged stock manipulator (by the SEC) Tobin Smith began discussing BOFI shares alongside Greg Garrabrants. Tobin Smith has multiple ties to Jason Galanis, including an Equities Magazine

connection. Furthermore, BOFI began funding Victory Park Capital at some point in early 2015. Legal proceedings point to a relationship between Jason Galanis and Victory Park Capital, as Galanis allegedly employed the assistance of Victory Park Capital during the Gerova fraud in Jan 2010. BOFI also funds an entity call ECC SPE that is tied to Emerald Creek Capital. ***Jason Galanis took out a $7 million load from Emerald Creek in early 2015 that has subsequently gone into delinquency since Galanis's arrest. ECC SPE transferred the collateral behind the Galanis loan to BOFI Federal Bank (this transaction remains undisclosed by BOFI). The property underlying the loan is currently of interest to the Department of Justice as it attempts to recover losses on behalf of victims of Galanis…. My research leads me to believe that a reasonable person could infer that Galanis has a relationship with BOFI that remains undisclosed to this date.***

***

Will BOFI be reserving against this loan on its balance sheet? Does BOFI plan on disclosing this humongous $7 million loan to investors, or disclosing that an SPE that it funds made a loan to Galanis against a property that is now of interest to the Department of Justice? We will see on this upcoming quarterly call.

***

Although any loan to a convicted fraudster may not be unusual, it is noteworthy because ***(1) BOFI has downplayed its role in lending to criminals during earnings calls by saying a law firm has found Erhart's "allegations to be without factual basis," (2) Any connection to a convicted fraudster, regardless of the loan seeming usual or unusual, is notable for a federally insured bank, and (3) NUMEROUS touchpoints between Galanis and BOFI are notable***. . . .

46. The above information partially disclosed to the market that despite Defendants' assurances, BofI did in fact loan money to criminals. However, Defendants continued to deny these allegations further misleading investors.

**BofI Failed to Disclose Material Information Concerning Pending Government Investigations**

47. Although Defendants stated otherwise, the SEC, DOJ, FDIC and other federal agencies are/were investigating Defendants BofI and Garrabrants during the Class Period.

48. For example, newly discovered SEC documents obtained by *Probes Reporter*, a subscription research service focused on SEC investigations, confirm the existence of an undisclosed formal SEC investigation that began in February 2016.

49. On May 28, 2015, the SEC opened a Matter Under Inquiry ("MUI") with respect to BofI. A MUI is an informal investigation and is generally less serious in nature than a formal investigation. The SEC conducts the informal investigation without subpoena power.

50. "Opening a MUI requires that the staff assigned to a MUI...first conduct preliminary analyses to determine…whether the facts underlying the MUI show that there is potential to address conduct that violates the federal securities laws…." SEC Division of Enforcement, Enforcement Manual, at 12 (2017).

51. On February 11, 2016, the MUI was closed and a formal investigation of BofI was opened.

52. On February 22, 2016, SEC staff issued a subpoena to BofI as part of its formal investigation, the focus of which was on (i) related party transactions; (ii)

activities of the board, audit committee and management regarding conflicts of interest; and (iii) loans made between BofI and Encore Capital Group, Inc. ("Encore") or Propel Financial Services, LLC (the "February 22, 2016 Subpoena"). The Company did not disclose that it received this subpoena as part of an SEC formal investigation of the Company.

53. Defendant Grinberg, who served as Chairman of the Audit Committee of the Board of Directors of the Company and the Bank until February 2017, also served as CFO of Encore, one of the country's largest debt collectors. In May 2012, BofI financed Grinberg-related entities to facilitate a deal – (i) Encore acquired Propel Financial Services, LLC; (ii) Propel Financial 1, LLC and Propel Funding Holdings 1, LLC became Encore subsidiaries; (iii) Grinberg remained CFO of Encore and became Executive Vice President and Treasurer of Propel Financial 1, LLC; (iv) and BofI provided a $31.9 million loan facility to the two Encore subsidiaries (the "BofI Financing Transaction"). Because BofI financed Propel entities that are co-managed directly by the Chairman of its own Audit Committee, the BofI Financing Transaction was a related-party transaction that should have been disclosed by BofI. Moreover, the Audit Chairman's clandestine dealings constitute a deficiency of internal controls. The SEC issued the February 22, 2016 Subpoena as a result of, *inter alia*, a January 6, 2016 *Seeking Alpha* article entitled "*BofI: Undisclosed Related Party Dealings Found To Infect Audit Committee*" that brought

the BofI Financing Transaction to light (the "January 6, 2016 *Seeking Alpha* Article").

54. Additionally, in March 2012, BofI made a mortgage loan to Jonathan Ball, BofI's Chief Internal Auditor, who was responsible for auditing BofI's related party transactions. This created a conflict of interest that BofI failed to disclose. This transaction also came to light as a result of the January 6, 2016 *Seeking Alpha* Article, triggering the February 22, 2016 Subpoena because of, *inter alia*, this conflict of interest.

55. On October 19, 2016, the SEC expanded its investigation and issued a second subpoena as part of its formal investigation that sought numerous documents related to single-family residential loans extended to non-resident aliens. This second subpoena is the result of the Bank's practice of making large mortgages to non-resident aliens, a practice that must comply with federal regulations aimed at stopping money laundering. The Company never disclosed that it received this second subpoena.

56. The existence of federal investigations into its lending practices and compliance with its code of ethics regarding related party transactions and conflicts of interest was highly material to investors. Even after being served with two SEC subpoenas focusing on these matters, Defendants repeatedly issued statements denying SEC activity.

57. As set forth below, the Individual Defendants were aware of this SEC investigation, as well at the DOJ and FDIC investigations.

58. According to CW 1, who worked in the San Diego headquarters as a Senior Mortgage Officer and Team Lead in unconventional loans at the Bank from February 2015 to June 2017, Defendants Garrabrants and Micheletti were aware of the formal SEC probe before CW 1 and CW 1's colleagues learned of it in March 2016. CW 1 found out about the formal SEC probe from Defendants Garrabrants and Micheletti.

59. CW 1 was a senior employee "pretty close to the top" who heard the Company's top executives talk about the SEC probe many times. Defendant Garrabrants attributed the probe to "some short seller hit pieces."

60. CW 1 first heard about various federal investigations after the August 22, 2015 *New York Times* article discussed earlier. "Eyes were on us like a hawk." "Every agency that had to do with banks was looking over our shoulder." CW 1 recalls discussing the various investigations with Defendant Garrabrants following the article as they worked to get the various regulators the records they were seeking.

61. CW 2 worked in the San Diego headquarters as a Mortgage Consultant at the Bank from May 2013 to August 2016. CW 2 observed many federal regulators in the Company's offices during her tenure. CW 2 could not estimate the number of investigators present at BofI but said that there were a large number of individuals

from various federal agencies and they reviewed hundreds of documents. According to CW 2, there was no way Defendants *Garrabrants, Micheletti or anyone else at the Company's headquarters* could miss the investigators because they were so numerous and added even more stress to the high-stress work environment.

62. CW 4 worked in the San Diego headquarters as an Assistant Vice President, Processing Manager in Residential Lending from September 2000 to January 2015. CW 4 worked in a culture where cover ups and lying to the authorities were permitted. During CW 4's tenure, senior management, including Defendants Garrabrants and Micheletti, flouted internal policies and government regulations. CW 4 said: "We knew what was going on." "BofI did a really good job at hiding things. I knew they hid things from regulators." CW 4's boss found ways to avoid providing information to the compliance department as well as regulators. "I remember when they would meet with the compliance team, our department would be questioned where certain things were." "Our management would find a way not to provide it to the compliance department." CW 4 sat in on meetings when CW 4's boss discussed "how they could represent to regulators as if we didn't fail anything or as if we weren't flouting certain procedures." With respect to the application of Bank Secrecy Act regulations, "[t]hey would definitely amend certain things to make it appear that we were following protocol." "They would create an answer or response to make it seem like we are following the rules or procedures."

Additionally, the Bank had controls in its software that gave regulators or certain employees access to only certain files. Meaning, other files in the Bank's database were not visible to regulators and some employees.

63. CW 5 worked in the San Diego headquarters as a Marketing Analyst at BofI from July 2015 to March 2017. During CW 5's tenure, CW 5 heard about the BofI federal probes at around the end of 2015. From that point on, the federal probes were ongoing. Although CW 5 was not aware as to whether the probe was conducted by the DOJ, SEC, Treasury or a combination of the agencies, CW 4 was confident that the ongoing federal probe was not conducted by the OCC because "[w]e were good with the OCC." CW 5 confirmed that Defendants Garrabrants and Micheletti definitely knew about the federal probes and notified BofI staff of the federal probes shortly before an investor call.

64. Based on the above allegations in ¶¶ 33-63, it is clear that Defendants acted with scienter when deciding to misrepresent and/or omit material information regarding both lending to criminals and investigations by the government.

65. As a result of these materially false misstatements and omissions, investors were unable to gauge the extent of the risks to which BofI faced and the extent of the government investigations. Accordingly, investors were deceived into purchasing shares at artificially inflated prices and were subsequently harmed when the truth became known.

## MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

66. The Individual Defendants possessed the power and authority to, and did, control the contents of BofI's filings with the SEC, press releases and presentations to institutional investors, securities analysts, and portfolio managers. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be materially false and misleading prior to, or shortly thereafter, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

### Q3 2016 (Quarterly period ending March 31, 2016)

67. The Class Period begins on March 14, 2016, when BofI filed a Form 8-K with the SEC, signed by Defendant Micheletti that states:

> As previously disclosed, on October 13, 2015, Charles Matthew Erhart, a former employee of BofI Federal Bank, filed a Complaint in the United States District Court for the Southern District of California against BofI Holding, Inc., alleging certain wrongdoing, fraud and impropriety in the operations, and by the management, of the Bank. The Audit Committee of the Board of Directors engaged the law firm of Dentons US LLP to conduct an independent investigation to determine whether there is support for the factual allegations and the conclusions contained in the Complaint. ***After an extensive investigation, Dentons advised the Audit Committee that, based on its investigation, it found no support for the conclusions of Mr. Erhart in the Complaint that the Bank or management engaged in wrongdoing or acts of fraud or impropriety.***

68. On April 18, 2016, BofI issued a press release regarding share price volatility. The press release referenced Erhart's Whistleblower Complaint, another class action against BofI, and "short-seller hit pieces." The press release states (emphasis added): "BofI, like other banks, is regularly examined by its federal regulators…. ***The absence of public enforcement actions highlight how disconnected these allegations are from the reality of BofI's highly compliant and top-performing business.***"

69. On April 28, 2016, BofI filed a quarterly report on Form 10-Q with the SEC, signed by Defendants Garrabrants and Micheletti, announcing the Company's financial and operating results for the quarter ended March 31, 2016 (the "Q3 2016 10-Q"). For the quarter, BofI reported net income of $35.91 million, or $0.56 per diluted share, on revenue of $92.87 million, compared to net income of $21.07 million, or $0.34 per diluted share, on revenue of $59.03 million for the same period in the prior year.

70. The Q3 2016 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Garrabrants and Micheletti, stating that the financial information contained in the Q3 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

71. On April 28, 2016, BofI conducted an earnings conference call. During the call, Defendant Garrabrants stated (emphasis added):

> ***The bank is in a strong regulatory standing, with no enforcement actions, has not been fined a single dollar by any regulatory agency and has not been required to modify its products or business practices.***
>
> ***
>
> The fact that we completed a $50 million debt offering, received an investment grade rating from Kroll, closed the Pacific Western Equipment Finance acquisition and ***remain in excellent regulatory standing is clear evidence that the bank has never been healthier.***

72. The statements referenced in ¶¶ 67-71 above were materially false and/or misleading because: (i) Defendant Garrabrants, having opted to speak on behalf of the Company on the subject of BofI's regulatory standing, lack of enforcement actions, and lack of fines, did not speak in an accurate and complete manner. Neither he, nor any of the Defendants, disclosed that the SEC, DOJ, and FDIC were investigating BofI and Garrabrants. Such investigations needed to be disclosed because their omission created the impression of a state of affairs that differed in a material way from the one that actually existed at that time; (ii) the Company, having opted to speak on behalf of the Company on the subject of the lack of enforcement actions, did not speak in an accurate and complete manner. Neither BofI, nor any of the Defendants, disclosed that the SEC, DOJ, and FDIC were investigating BofI and Garrabrants. Such investigations needed to be disclosed because their omission created the impression of a state of affairs that differed in a

material way from the one that actually existed at that time; (iii) Defendant Micheletti, having opted to speak on behalf of the Company on the subject of Erhart's Whistleblower Complaint, did not speak in an accurate and complete manner. Neither he, nor any of the Defendants, disclosed that there was a second whistleblower, and that BofI did make loans, directly or indirectly, to criminals. Such disclosure needed to be made because the omission created the impression of a state of affairs that differed in a material way from the one that actually existed at the time; and (iv) BofI failed to disclose that a material portion of the Company's earnings were derived from loans made directly or indirectly to criminals.

73. BofI also had an affirmative duty to disclose the government investigations to investors under Item 103 of Regulation S-K. Under SEC Regulation S-K, 17 C.F.R. §§ 229.103 ("Item 103"), BofI was required to disclose to investors whether any legal proceedings were even being ***contemplated*** by governmental authorities. Item 103 states in full:

> Describe briefly any material pending legal proceedings, other than ordinary routine litigation incidental to the business, to which the registrant or any of its subsidiaries is a party or of which any of their property is the subject. Include the name of the court or agency in which the proceedings are pending, the date instituted, the principal parties thereto, a description of the factual basis alleged to underlie the proceeding and the relief sought. Include similar information as to any such proceedings known to be contemplated by governmental authorities.

74. Whereas BofI was only required to disclose "***pending***" legal proceedings against the public, Item 103 specifically provides that if a governmental authority is even "***contemplat[ing]***" a material legal proceeding, Defendants must disclose this information. First, when the SEC opened the formal investigation against BofI, it initiated a material proceeding. The SEC initially opened an MUI on May 28, 2015. When this MUI was closed and the SEC opened a formal investigation on February 11, 2016, the SEC opened a "proceeding" titled *In the Matter of BofI Holding, Inc.*, LA-4558. The SEC Enforcement Division's manual states the following about the "Formal Order Process" (emphasis added):

> 2.3.4 Formal Order Process
>
> Introduction:
> Pursuant to delegated authority, the Director of the Division may, in his or her discretion, issue a formal order when a formal investigation is appropriate and necessary to determine whether a violation of the federal securities laws may have occurred or may be occurring. The formal order serves two important functions. First, it generally describes the nature of the investigation that has been authorized, and second, it designates specific staff members to act as officers for the purposes of the investigation and empowers them to administer oaths and affirmations, subpoena witnesses, compel their attendance, take evidence, and require the production of documents and other materials. ***Formal investigative proceedings*** are nonpublic unless otherwise ordered by the Commission.
>
> Basics of the Formal Order Process:
> The Commission has delegated authority to issue formal orders to the Director of the Division of Enforcement. To seek a formal order of investigation, staff should draft a memo for review by the Director, as well as a proposed order. If authorized by the Director, the formal order will be issued by the Office of

> the Secretary. A MUI should be converted to an investigation in HUB before issuance of a formal order.

75. According to the subpoenas issued to BofI on February 22, 2016, and October 19, 2016, the subpoenas "[were] issued pursuant to a formal order entered by the United States Securities and Exchange Commission." The subpoenas were issued "[p]ursuant to Rule 8 of the United States Securities and Exchange Commission's Rules Relating to Investigations, 17 C.F.R. § 203.8 . . . ." 17 C.F.R. § 203.8, governs the service of subpoenas and states that subpoenas must be effected in the manner prescribed by 17 C.F.R. § 201.323(c). 17 C.F.R. § 201.323 is titled "Subpoenas." Within this section, the formal investigations initiated by the SEC are routinely referred to as "proceedings." *See* 17 C.F.R. § 201.232 (a)(1), 17 C.F.R. § 201.232 (e)(1), and 17 C.F.R. § 201.232 (e)(3). Further, the SEC Enforcement manual states the following about "Subpoenas for Documents" (emphasis added):

> **3.2.6 Subpoenas for Documents**
>
> Basics:
> The Commission, or the staff it designates as officers in a formal order of investigation, may issue subpoenas for documents or witnesses, pursuant to Section 19(c) of the Securities Act, Section 21(b) of the Exchange Act, Section 209(b) of the Advisers Act, and Section 42(b) of the Investment Company Act. The Commission or its designated officers may require the production of any records deemed relevant or material to the inquiry and may require their production from any place in the United States.
>
> - To issue a subpoena for documents, a staff member must be named as an officer for purposes of an investigation in the Commission's formal order. Once the Commission has issued a formal order, the

staff named as officers in the order may issue subpoenas.

- Some documents cannot be obtained without issuing a subpoena, such as records from telephone companies or banks.
- A subpoena for documents should be accompanied by a Form 1662.
- Rule 7(a) of the SEC's Rules Relating to Investigations provides that any person who is compelled or required to furnish documents or testimony at ***a formal investigative proceeding*** shall, upon request, be shown the formal order. Such a person may also obtain a copy of the formal order by submitting a written request to the Assistant Director supervising the investigation. See 17 C.F.R. § 203.7(a).
- A subpoena for documents should include an attachment to the subpoena listing the documents requested (generally by category or type of document.

76. Therefore, the opening of a formal proceeding by the SEC was a material proceeding by a government agency that should have been disclosed pursuant to Item 103.

77. Even if this was not a "proceeding" (it was), this shows that when the informal investigation ended, and the formal investigation began, the government was at minimum ***contemplating*** a material proceeding. This also requires disclosure under Item 103. These investigations were material because an adverse outcome of any of these investigations may have resulted in fines or disgorgement which could have a material adverse effect on the BofI's consolidated financial position, results of operations and cash flows. Therefore, these investigations should have been disclosed to investors.

**Q4 2016 (Quarterly period ending June 30, 2016) and 2016 Annual Report**

78. On August 2, 2016, BofI conducted an earnings conference call. During the call, Defendant Garrabrants stated (emphasis added):

> The events alleged by former junior employee, Erhart, happened almost 1.5 year ago, by his account. ***One of the world's largest law firms conducted an independent investigation and found his allegations to be without factual basis and cleared management of the alleged wrong-doing.*** Subsequently, the bank has completed two record-setting fiscal years, closed two acquisitions ***that both required regulatory approval and successfully completed multiple OCC and Federal Reserve Regulatory examinations.***
>
> ***
>
> ***The bank is in strong regulatory standing with no enforcement actions, has not been fined a single dollar by any regulatory agency, has not been required to modify its products or business practices***.
>
> ***
>
> The regulatory exams are always completed, but as I've said on past calls, the nature of being a regulated entity is that we've constant dialogue with regulators, including the OCC, SEC, FDIC and the Fed. I know that you got involved and a little spat over what the term investigation is and how it's defined and that sort of thing. ***And it's interesting because the term investigation isn't defined in Securities Law and you can characterize any question or one question as investigation, and the nature of regulatory dialogue is there's constant questions in the inquiry. And so, I think the important thing to note and what's the most important is if there is any event that's occurred that would require disclosure, the answer is absolutely no.***
>
> ***So we've not been asked any question or received any inquiry from any agency, including the SEC that would suggest concerns regarding financial misrepresentation, financial results, estimates, or other matters that would require an 8-K. And so, we have with regard to the OCC, obviously, our primary regulator, we have 2 -- we have a full scope exam and an interim exam. Our full scope exam for this year is complete.*** We know where that is. Obviously, we cannot talk about the specific results, but I was very clear that we have no

> constraints on our business. ***We have no enforcement actions and we frankly don't have any issues that would lead me to think that we have to change any single thing about what we're doing. So while the amount of noise that the short-sellers have been able to generate is impressive, the actual impact on the operations of the business is nothing. And so allow me to repeat. We have not been asked any questions that or received any inquiry that would suggest any concerns about our financials, financial misrepresentations, financial results estimates or anything else that would require the filing of an 8-K, meaning that would be material.***

79. On August 3, 2016, in an article entitled "*Court Filings Reveal Existence Of Undisclosed Second Alleged BofI Whistleblower*," *Seeking Alpha* commented on Garrabrants' statements regarding investigations set forth above: "During last night's BofI Holding earnings call, we were highly entertained by the discussion surrounding 'investigations' and what the definition of an 'investigation' is. In fact, when we asked Bloomberg to provide us with a transcript of the call, we got this odd video response [of Bill Clinton stating it depends on what the meaning of the word is is]."

80. On August 25, 2016, BofI filed an annual report on Form 10-K with the SEC, signed by Defendants Garrabrants, Micheletti, and Grinberg, announcing the Company's financial and operating results for the quarter and fiscal year ended June 30, 2016 (the "2016 10-K"). For the quarter, BofI reported net income of $29.73 million, or $0.46 per diluted share, on revenue of $86.17 million, compared to net income of $24.40 million, or $0.39 per diluted share, on revenue of $65.57 million

for the same period in the prior year. For fiscal year 2016, BofI reported net income of $119.29 million, or $1.85 per diluted share, on revenue of $327.35 million, compared to net income of $82.68 million, or $1.34 per diluted share, on revenue of $229.54 million for fiscal year 2015.

81. In the 2016 10-K, the Company stated, in relevant part (emphasis added):

> **Anti-Money Laundering and Customer Identification.** The U.S. government enacted the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act") on October 26, 2001 in response to the terrorist events of September 11, 2001. The USA PATRIOT Act gives the federal government broad powers to address terrorist threats through enhanced domestic security measures, expanded surveillance powers, increased information sharing, and broadened anti-money laundering requirements. In February 2010, Congress re-enacted certain expiring provisions of the USA PATRIOT Act.
>
> ***
>
> We operate in a highly regulated industry and are subject to oversight, regulation and examination by federal and/or state governmental authorities under various laws, regulations and policies, which impose requirements or restrictions on our operations, capitalization, payment of dividends, mergers and acquisitions, investments, loans and interest rates charged and interest rates paid on deposits. ***We must also comply with federal anti-money laundering, tax withholding and reporting, and consumer protection statutes and regulations.*** A considerable amount of management time and resources is devoted to oversight of, and development and implementation of controls and procedures relating to, compliance with these laws, regulations and policies.

82. Statements regarding anti-money laundering compliance are of particular interest to shareholders in light of the allegations in Erhart's Whistleblower Complaint discussed in ¶¶ 37-38 herein.

83. The 2016 10-K also contained signed certifications pursuant to SOX by Defendants Garrabrants and Micheletti, stating that the financial information contained in the 2016 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

84. The statements referenced in ¶¶ 78, 80-81, 83 above were materially false and/or misleading because: (i) Defendant Garrabrants, having opted to speak on behalf of the Company on the subject of BofI's regulatory standing, investigations (including his definition of an investigation and denial that the Company has been asked any question or received any inquiry from any agency, including the SEC, that would suggest concerns regarding financial misrepresentation, financial results, estimates, or other matters that would require an 8-K), lack of enforcement actions, and lack of fines, did not speak in an accurate and complete manner. Neither he, nor any of the Defendants, disclosed that the SEC, FDIC, and DOJ were investigating BofI and Garrabrants, and that the DOJ's investigation related to money laundering. Such investigations needed to be disclosed because their omission created the impression of a state of affairs that differed in a material way from the one that actually existed at that time;

(ii) Defendant Garrabrants, having opted to speak on behalf of the Company on the subject of the Erhart Whistleblower Complaint, did not speak in an accurate and complete manner. Neither he, nor any of the Defendants, disclosed that there was a second whistleblower, and that BofI did make loans, directly or indirectly, to criminals. Such disclosure needed to be made because the omission created the impression of a state of affairs that differed in a material way from the one that actually existed at the time; and (iii) BofI failed to disclose that a material portion of the Company's earnings were derived from loans made directly or indirectly to criminals.

85. The above statement, "[w]e have not been asked any questions that or received any inquiry that would suggest any concerns about our financials, financial misrepresentations, financial results estimates or anything else that would require the filing of an 8-K, meaning that would be material[,]" was misleading for an additional reason. The federal investigations were focused on BofI's lending practices to foreign nationals as well as related party transactions and conflicts of interest. In addition to BofI, the federal investigations also targeted Defendant Garrabrants. These are matters that are material to BofI. Although the Instructions for Form 8-K, unlike Regulation S-K, do not require the disclosure of any investigation or legal proceeding, they do require immediate disclosure of matters regarding a company's code of ethics as well as the employment status of executive

officers. The federal investigations indicated concerns about BofI's compliance with its code of ethics (which governed related party transactions and conflicts of interest) as well as the activities of its chief executive officer, Defendant Garrabrants. For example, the SEC specifically requested documents:

- All Documents Concerning BofI's policies, procedures, and practices for identifying, reviewing, and disclosing transactions with related parties.
- All Documents Concerning internal controls over approval and disclosure of related-person transactions.
- All Documents Concerning internal controls over conflicts of interest.
- All Documents Concerning conflict of interest policies.
- All Documents Concerning conflict of interest statements by your management and directors.
- All Documents Concerning disclosures made under BofI's conflicts of interest policy and lending practices policy.
- All Documents Concerning any waivers to BofI's Code of Conduct.
- All Board of Director, Audit Committee, and Compensation Committee meeting minutes.
- All Documents evidencing compliance with BofI's Audit Committee Charter.
- All Documents Concerning any loan made between BofI and Encore Capital Group, Inc. or Propel Financial Services, LLC. This should include, but is not limited to:
    - Documents Concerning negotiations of the loan terms.
    - Any loan Agreement entered into and any revisions or amendments thereto.
    - Documents evidencing payments and repayments on these loans.
    - Any collateral or security interest pledged by BofI, Encore, or Propel to secure these loans.
    - Documents Concerning how these loans arose, how there were approved, and how they were accounted for on BofI's books.
    - Any information or representations Concerning these loans provided to BofI's Board of Directors or Audit Committee.
    - Any information or representations Concerning these loans provided to BofI's internal or external auditors.

  - Communications from or to [redacted] Concerning these loans.
- Documents sufficient to identify the percentage of BofI's single-family residential loans ("SFRs" extended to non-resident aliens ("NRAs").
- Documents Concerning BofI's underwriting standards for SFRs to NRAs.
- Documents Concerning historical performance of SFRs to NRAs.
- Analysis of risks associated with lending to NRAs.
- Communications Concerning risks associated with lending to NRAs including, but not limited to, Communications with:
  - BofI's internal auditors.
  - BofI's SEC reporting personnel.
  - BofI's CFO.
  - BofI's Audit Committee.
  - BofI's external auditors.

86. These are matters that are so highly material to investors that they are included on the list of matters on which the SEC mandates disclosure on Form 8-K. Therefore, the above representation was materially misleading to investors because it created the false impression that BofI was not under a material investigation.

87. Further, investors and analysts relied on these statements. For example, on August 3, 2016, Sandler O'Neill and Partners, L.P. specifically referenced Defendants' statements, including the lack of filing of a Form 8-K. Sandler O'Neill states in relevant part:

> There are no enforcement actions against it, it has not been subject to any regulatory fines and it has not been forced to modify its business practices or products. In addition, management said it has ongoing dialogue with the OCC, SEC, FDIC, and the Federal Reserve, and that there have been no events that would require disclosure to investors. There have not been any inquiries from any regulatory agency that would suggest concerns of financial misrepresentation, financial results

> or other matters that would be material and require filing an 8-K. These statements from management are certainly positive.

The reliance by analysts also shows that this information was material to investors.

88. In addition, Defendants had an affirmative duty to disclose the investigations in the 2016 10-K under Item 103 because the SEC had initiated a material "proceeding" against BofI. Alternatively, the investigations into BofI showed that government agencies were at least contemplating a legal proceeding against BofI. Therefore, Defendants had a duty to disclose this information.

89. Accordingly, the above statements were materially false and misleading.

**Q1 2017 (Quarterly period ended September 30, 2016)**

90. On October 27, 2016, BofI filed a quarterly report on Form 10-Q with the SEC, signed by Defendants Garrabrants and Micheletti announcing the Company's financial and operating results for the quarter ended September 30, 2016 (the "Q1 2017 10-Q"). For the quarter, BofI reported net income of $28.90 million, or $0.45 per diluted share, on revenue of $84.51 million, compared to net income of $25.50 million, or $0.40 per diluted share, on revenue of $68.92 million for the same period in the prior year.

91. The Q1 2017 10-Q contained signed certifications pursuant to SOX by Defendants Garrabrants and Micheletti, stating that the financial information

contained in the Q1 2017 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

92. On October 27, 2016, BofI conducted an earnings conference call. During the call, Defendant Garrabrants stated the following (emphasis added):

> Before I turn the call over to Andy to discuss our financial results, I wanted to comment briefly on another rambling and certain short-seller hit piece that was covered two days ago. . . . [I]t appears to lead [that] BofI has a financial interest or some sort of economic and legal exposure to a loan either to or guaranteed by Jason Galanis. I wanted to clarify BofI has no interest credit exposure ownership of any loan, any kind of loan to Jason Galanis or any loan to Jason Galanis who is a guarantor including the $7 million loan mentioned in the hit piece.
>
> I'll provide a brief update on our litigation. As I said last quarter, I'll not be spending much time on this because these lawsuits are old news. The events alleged by former junior employee, Erhart, happened almost the year and nine months ago, by his account. ***One of the world's largest law firms conducted an independent investigation of his allegation and found his allegations to be without factual basis and cleared management of any alleged wrong-doing. Subsequently, the bank has completed two record-setting fiscal years, closed two acquisitions that both required regulatory approval, successfully completed two full annual examinations to mid-cycle examinations and multiple Federal Reserve Regulatory examinations***.
>
> ***The bank remains in strong regulatory standing with no enforcement actions, has not been fined a single dollar by any regulatory agency, and has not been required to modify its products or business practices.***

93. The statements referenced in ¶¶ 90-92 above were materially false and/or misleading because (i) Defendant Garrabrants, having opted to speak on behalf of BofI on the subject of BofI's regulatory standing, lack of enforcement

actions, and lack of fines, did not speak in an accurate and complete manner. Neither he, nor any of the Defendants, disclosed that the SEC, DOJ, and FDIC were investigating BofI and Garrabrants. Such investigations needed to be disclosed because their omission created the impression of a state of affairs that differed in a material way from the one that actually existed at that time; (ii) BofI did in fact make loans, directly or indirectly, to criminals; and (iii) BofI failed to disclose that a material portion of the Company's earnings were derived from loans made directly or indirectly to criminals.

94. Defendants also had an affirmative duty to disclose the investigations in the Q1 2017 10-Q under Item 103 because the SEC had initiated a material "proceeding" against BofI. Alternatively, the investigations into BofI showed that government agencies were at least contemplating a legal proceeding against BofI. Therefore, Defendants had a duty to disclose this information.

**Q2 2017 (Quarterly period ended December 31, 2016)**

95. On January 30, 2017, BofI filed a quarterly report on Form 10-Q with the SEC, signed by Defendant Garrabrants and Micheletti, announcing the Company's financial and operating results for the quarter ended December 31, 2016 (the "Q2 2017 10-Q"). For the quarter, BofI reported net income of $32.30 million, or $0.50 per diluted share, on revenue of $93.06 million, compared to net income of

$28.15 million, or $0.44 per diluted share, on revenue of $79.39 million for the same period in the prior year.

96. The Q2 2017 10-Q contained signed certifications pursuant to SOX by Defendants Garrabrants and Micheletti, stating that the financial information contained in the Q2 2017 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

97. On January 31, 2017, BofI conducted an earnings conference call. During the call, Defendant Garrabrants stated (emphasis added):

> As I said last quarter, I'll not spend much time on this, because these lawsuits are old news. The events alleged by disgruntled and apparently from his latest court filing, now chronically unemployed former Junior employee Erhart happened two years ago by his account. ***One of the world's largest law firms conducted an independent investigation of his allegations and found his allegations to be without factual basis and cleared management of the alleged wrongdoing.***
>
> Subsequently, ***the Bank has completed two record-setting fiscal years, two successful quarters after the close of our most recent record-setting fiscal year, closed two … acquisitions that both required regulatory approval, successfully completed three mid-cycle examinations, two full annual examinations, multiple Federal Reserve regulatory examinations, and received regulatory non-objection in the last six months to launch a refund advance product with H&R Block.***
>
> ***The Bank remains in a strong regulatory standing with no enforcement actions, has not been fined a single dollar of any regulatory agency, and is not been required to modify its products or business practices.***

98. The statements referenced in ¶¶ 95-97 above were materially false and/or misleading because: (i) Defendant Garrabrants, having opted to speak on behalf of the Company on the subject of BofI's regulatory standing (including "regulatory approval[s,]" "successfully complet[ing] three mid-cycle examinations, two full annual examinations, multiple Federal Reserve regulatory examinations, and received regulatory non-objection . . . to launch a refund advance product with H&R Block"), lack of enforcement actions, and lack of fines, did not speak in an accurate and complete manner. Neither he, nor any of the Defendants, disclosed that the SEC, DOJ, and FDIC were investigating BofI and Garrabrants. Such investigations needed to be disclosed because their omission created the impression of a state of affairs that differed in a material way from the one that actually existed at that time; (ii) Defendant Garrabrants, having opted to speak on behalf of the Company on the subject of the Erhart Whistleblower Complaint, did not speak in an accurate and complete manner. Neither he, nor any of the Defendants, disclosed that BofI made loans, directly or indirectly, to criminals. The DOJ probe for money laundering is linked to this business practice; and (iii) BofI failed to disclose that a material portion of the Company's earnings were derived from loans made directly or indirectly to criminals.

99. Defendants also had an affirmative duty to disclose the investigations in the Q2 2017 10-Q under Item 103 because the SEC had initiated a material

"proceeding" against BofI. Alternatively, the investigations into BofI showed that government agencies were at least contemplating a legal proceeding against BofI. Therefore, Defendants had a duty to disclose this information.

**Q3 2017 (Quarterly period ended March 31, 2017)**

100. On March 31, 2017, pre-market, the *New York Post* published an article entitled "Feds probe Bank of Internet for possible money laundering," disclosing that the Company was the subject of a probe led by the DOJ and involving the SEC and the Treasury Department. Notwithstanding the article, Bar Adon, the Company's Chief Legal Officer, ***denied that there were any material investigations that were required to be disclosed***. The article states in relevant part (emphasis added):

> **Feds probe Bank of Internet for possible money laundering**
>
> By Kevin Dugan March 31, 2017 | 1:27am | Updated
>
> Federal agents are conducting a probe into possible money laundering at online lender Bank of Internet, The Post has learned.
>
> The Justice Department, which is leading the investigation, has interviewed at least one former employee of the San Diego-based bank, sources said.
>
> Bank of Internet Chief Executive Gregory Garrabrants, head of the bank since 2007, is also a focus of the probe, sources said. Neither the 18-year-old bank nor Garrabrants has been accused of any criminal activity.

> Part of the probe is centered on regulatory filings made by Bank of Internet, also known as BofI, to the Office of the Comptroller of the Currency, according to four people familiar with the matter.
>
> ***
>
> "Greg has answered these questions over and over again, and I don't know why you're all of a sudden coming up with all of this silliness, and in pursuit of what?" Eshel Bar-Adon, BofI's chief legal officer, told The Post.
>
> Bar-Adon refused to answer questions about any possible criminal probe, but said the company was "completely unaware" of any indictments in the works.
>
> "Due to false allegations made in short seller hit pieces and pending litigation, agencies routinely ask questions to assure themselves that such allegations are without basis," Bar-Adon added in a written statement. ***"However, there are no material investigations that would require public disclosure and BofI remains in good regulatory standing."***
>
> Spokespersons for the Justice Department and OCC, which is also investigating, declined to comment. The Securities and Exchange Commission and the Treasury Department, also in the probe, didn't answer an e-mail seeking comment.
>
> It's not clear whether any of the probes will result in indictments.

101. That same day, BofI issued a press release in response to the *New York Post* article:

> A factually inaccurate and substantively misleading story was published in a widely circulated tabloid today. ***The story is nothing more than a rehash of baseless allegations that first surfaced over two years ago, and have been soundly refuted by BofI in court filings and on conference calls.***
>
> While addressing each and every incorrect or misleading statement set forth in the story is beyond the scope of these comments, a few

representative examples will be discussed. The apparent basis for the headline that the Bank is under a federal money laundering probe is an assertion that "BofI allegedly filed incorrect call reports to hide loans made to foreign nationals without requiring them to provide a tax identification number." This allegation is inexplicable given that applicable law does not require tax identification numbers of non-resident aliens who are not engaged in a trade or business in the United States. ***The Company has received no indication of, and has no knowledge regarding, such purported money laundering investigation.***

Elsewhere in the story, a statement is made that "the CEO deposited third-party checks into his personal account, the suit claims" without noting that the checks related to structured settlement payments the CEO had purchased in a court approved transaction that included the granting to him of a power of attorney to endorse the checks, and that the deposits were handled in compliance with Bank procedure and applicable regulatory requirements. In other words, Mr. Garrabrants acted properly and in accordance with law in depositing such checks.

In a third misleading statement, the story asserts that Mr. Garrabrants was a signatory on an account belonging to "Charles Erhart, Charles' brother and a minor league baseball player earning poverty wages," a patently absurd allegation that first appeared in the story and was not made in the civil lawsuit to which the writer attributes it.

***Since these meritless allegations first surfaced, the Bank has completed two record-setting fiscal years, closed two acquisitions that both required regulatory approval, successfully completed two full annual examinations, two mid-cycle examinations and multiple Federal Reserve Regulatory examinations. The Bank and the Company remain in strong regulatory standing with no enforcement actions. Neither has been fined a single dollar by any regulatory agency, or been required to restate financials, or modify product offerings or business practices. We do not foresee any future impact to the underlying business as a result of these frivolous allegations or their current repetition in the press.***

BofI Federal Bank, like other banks, is regularly examined by its federal

> regulators, external auditors, and internal auditors. As previously disclosed by the Company, the Audit Committee of the Board of Directors engaged one of the largest law firms in the world to conduct an independent investigation to determine whether there is support for these two year old allegations when they were made in an employment lawsuit filed by Charles Erhart. ***After an extensive investigation, the outside law firm advised the Audit Committee that it found no support for the allegations set forth in the employment complaint, or that the Bank or its management engaged in wrongdoing or acts of fraud or impropriety***.

102. On April 25, 2017, BofI filed a quarterly report on Form 10-Q with the SEC, signed by Defendants Garrabrants and Micheletti, announcing the Company's financial and operating results for the quarter ended December 31, 2016 (the "Q3 2017 10-Q"). For the quarter, BofI reported net income of $40.99 million, or $0.63 per diluted share, on revenue of $111.73 million, compared to net income of $35.91 million, or $0.56 per diluted share, on revenue of $92.87 million for the same period in the prior year.

103. The Q3 2017 10-Q contained signed certifications pursuant to SOX by Defendants Garrabrants and Micheletti, stating that the financial information contained in the Q3 2017 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

104. The statements referenced in ¶¶ 100-103 above were materially false and/or misleading because: (i) Defendant Bar-Adon, having opted to speak on behalf of the Company on the subject of investigations and indictments, did not speak in an

accurate and complete manner. Neither he, nor any of the Defendants, disclosed that the SEC, DOJ, and FDIC were investigating BofI and Garrabrants. Such investigations needed to be disclosed because their omission created the impression of a state of affairs that differed in a material way from the one that actually existed at that time; (ii) by making statements in the press release, the Company opted to speak on the subject of investigations, regulatory standing, lack of enforcement actions, lack of fines, and did not speak in an accurate and complete manner. The Company failed to disclose that the SEC, DOJ, and FDIC were investigating Defendants BofI and Garrabrants. Such investigations needed to be disclosed because their omission created the impression of a state of affairs that differed in a material way from the one that actually existed at that time; (iii) by making statements in the press release, BofI opted to speak on the subject of the Erhart Whistleblower Complaint and did not speak in an accurate and complete manner. Neither BofI, nor any of the Defendants, disclosed that BofI made loans, directly or indirectly, to criminals. The DOJ probe for money laundering is linked to this business practice; and (iv) BofI failed to disclose that a material portion of the Company's earnings were derived from loans made directly or indirectly to criminals.

105. Defendants also had an affirmative duty to disclose the investigations in the Q3 2017 10-Q under Item 103 because the SEC had initiated a material

"proceeding" against BofI. Alternatively, the investigations into BofI showed that government agencies were at least contemplating a legal proceeding against BofI. Therefore, Defendants had a duty to disclose this information.

**Q4 2017 (Quarterly period ending June 30, 2017) and 2017 Annual Report**

106. On June 28, 2017, BofI's outside public relations counsel and spokesman, Stuart Pfeiffer of Sitrick & Co., parroted Defendant Garrabrants' words, at the behest of its client: "Due to false allegations made in short seller hit pieces and pending litigation, agencies routinely ask questions to assure themselves that such allegations are without basis. However, ***there are no material investigations that would require public disclosure and BOFI remains in good regulatory standing.***"

107. On July 27, 2017, BofI conducted an earnings conference call. During the call, Defendant Garrabrants stated (emphasis added):

> Additionally, we do not foresee any future impact on underlying business as a result of the frivolous lawsuits and short seller hit pieces. ***In fact***, contrary to short seller allegations and despite regulatory complaints the short-sellers filed, ***we have received confirmation from the SEC that no investigation is ongoing and no enforcement actions is contemplated against BofI***.

108. On August 24, 2017, BofI filed an annual report on Form 10-K with the SEC, signed by Defendants Garrabrants, Micheletti, and Grinberg, announcing the Company's financial and operating results for the quarter and fiscal year ended June 30, 2017 (the "2017 10-K"). For the quarter, BofI reported net income of $32.55

million, or $0.50 per diluted share, on revenue of $92.06 million, compared to net income of $29.73 million, or $0.46 per diluted share, on revenue of $86.17 million for the same period in the prior year. For fiscal year 2017, BofI reported net income of $134.74 million, or $2.07 per diluted share, on revenue of $381.36 million, compared to net income of $119.29 million, or $1.85 per diluted share, on revenue of $327.35 million for fiscal year 2016.

109. In the 2017 10-K, the Company stated, in relevant part (emphasis added):

> **Anti-Money Laundering and Customer Identification.** The U.S. government enacted the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act") on October 26, 2001 in response to the terrorist events of September 11, 2001. The USA PATRIOT Act gives the federal government broad powers to address terrorist threats through enhanced domestic security measures, expanded surveillance powers, increased information sharing, and broadened anti-money laundering requirements. In February 2010, Congress re-enacted certain expiring provisions of the USA PATRIOT Act.
>
> ***
>
> We operate in a highly regulated industry and are subject to oversight, regulation and examination by federal and/or state governmental authorities under various laws, regulations and policies, which impose requirements or restrictions on our operations, capitalization, payment of dividends, mergers and acquisitions, investments, loans and interest rates charged and interest rates paid on deposits. ***We must also comply with federal anti-money laundering, tax withholding and reporting, and consumer protection statutes and regulations.*** A considerable amount of management time and resources is devoted to oversight of, and development and implementation of controls and procedures relating to, compliance with these laws, regulations and policies.

110. Statements regarding anti-money laundering compliance are of particular interest to shareholders in light of the allegations in Erhart's Whistleblower Complaint discussed in ¶¶ 37-38 herein.

111. The 2017 10-K contained signed certifications pursuant to SOX by Defendants Garrabrants and Micheletti, stating that the financial information contained in the 2017 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

112. The statements referenced in ¶¶ 106-109, 111 above were materially false and/or misleading because: (i) Stuart Pfeiffer, speaking on behalf of the Company on the subject of investigations and at the direction of Defendant Garrabrants who was aware of the investigations, did not speak in an accurate and complete manner. Neither Stuart Pfeiffer, nor any of the Defendants, disclosed that the SEC had been investigating BofI. Moreover, neither he, nor any of the Defendants, disclosed that the FDIC and DOJ investigations concerning BofI and Garrabrants were ongoing, and that the DOJ's investigation related to money laundering. Such investigations needed to be disclosed because their omission created the impression of a state of affairs that differed in a material way from the one that actually existed at that time; (ii) Defendant Garrabrants, having opted to speak on behalf of the Company on the subject of the SEC investigation, did not

speak in an accurate and complete manner. Neither he, nor any of the Defendants, disclosed that the SEC had been investigating BofI. Moreover, neither he, nor any of the Defendants, disclosed that the FDIC and DOJ investigations concerning BofI and Garrabrants were ongoing, and that the DOJ's investigation related to money laundering. Such investigations needed to be disclosed because the omission created the impression of a state of affairs that differed in a material way from the one that actually existed at that time; and (iii) BofI failed to disclose that a material portion of the Company's earnings were derived from loans made directly or indirectly to criminals.

113. Defendants also had an affirmative duty to disclose the investigations by the FDIC and DOJ in the 2017 10-K under Item 103. Even if the SEC was no longer contemplating an investigation, the remaining government agencies were still conducting an investigation and contemplating whether to initiate legal proceedings. Therefore, Defendants had a duty to disclose this information.

## **THE TRUTH BEGINS TO EMERGE**

114. The revelation of the truth about loaning money to criminals, various BofI investigations regarding, among other things, money laundering, and witnesses lining up to be interviewed for the investigations, came about through a series of partial corrective disclosures and caused a decline in the market of BofI common stock beginning October 26, 2016. By making contemporaneous additional

misstatements in the form of denials in response to partial corrective disclosures by third parties, artificial inflation remained in the price of BofI stock throughout the Class Period.

115. As the true facts became known and/or the materialization of the risks that had been concealed by Defendants occurred, the price of BofI common stock declined as the artificial inflation was removed from the market price of the stock, causing damage to Lead Plaintiffs and the members of the Class.

116. The declines in the BofI common stock and the resulting losses are directly attributable to the disclosure of information and/or materialization of risks that were previously misrepresented or concealed by Defendants.

117. On October 26, 2016, *Seeking Alpha* published a blockbuster article entitled "*Barry Minkow? Jason Galanis? Just When I Thought I Had BOFI Figured Out... There's More!*" The article ties BofI to making indirect loans to Jason Galanis, a convicted fraudster, and discloses that the DOJ is involved. It states that BofI funded a special purpose entity that Galanis used for financing:

> In this report, I … show a series of connections in a $7 million loan to Jason Galanis (now delinquent and the subject of messy foreclosure proceedings that involve the Department of Justice). Investors ought to ask/wonder how this loan is being reflected on BOFI's balance sheet and/or if management will speak to said Galanis ties during the next earnings call.

***

Knightbrook Insurance is controlled by one of BOFI's largest shareholders. Knightbrook made a very odd preferred investment . . . into BOFI in November 2012. Knightbrook has a reinsurance relationship with an entity called New Olympia Re that Jason Galanis claimed to control…. Shortly after Knightbrook invested in BofI shares, an alleged stock manipulator (by the SEC) Tobin Smith began discussing BOFI shares alongside Greg Garrabrants. Tobin Smith has multiple ties Jason Galanis, including an Equities Magazine connection. Furthermore, BOFI began funding Victory Park Capital at some point in early 2015. Legal proceedings point to a relationship between Jason Galanis and Victory Park Capital, as Galanis allegedly employed the assistance of Victory Park Capital during the Gerova fraud in Jan 2010. BOFI also funds an entity called ECC SPE that is tied to Emerald Creek Capital. Jason Galanis took out a $7 million loan from Emerald Creek in early 2015 that has subsequently gone into delinquency since Galanis's arrest. ECC SPE transferred the collateral behind the Galanis loan to BOFI Federal Bank (this transaction remains undisclosed by BOFI). The property underlying the loan is currently of interest to the Department of Justice as it attempts to recover losses on behalf of victims of Galanis…. My research leads me to believe that a reasonable person could infer that Galanis has a relationship with BOFI that remains undisclosed to this date.

***

Will BOFI be reserving against this loan on its balance sheet? Does BOFI plan on disclosing this humongous $7 million loan to investors, or disclosing that an SPE that it funds made a loan to Galanis against a property that is now of interest to the Department of Justice? We will see on this upcoming quarterly call.

***

Although any loan to a convicted fraudster may not be unusual, it is noteworthy because (1) BOFI has downplayed its role in lending to criminals during earnings calls by saying a law firm has found Erhart's "allegations to be without factual basis," (2) Any connection to a convicted fraudster, regardless of the loan seeming usual or unusual, is

notable for a federally insured bank, and (3) NUMEROUS touchpoints between Galanis and BOFI are notable. . . .

118. This information revealed to the market that BofI engaged in dangerous business practices where risks were much higher than what was being reported, including, but not limited to, making loans directly/indirectly to criminals.

119. The author of the article, Real Talk Investments, is a financial contributor on *Seeking Alpha*. Real Talk Investments goes through a specialized analysis connecting integral information to arrive at the conclusion that BofI was involved in a $7 million loan to Galanis. The author makes a connection between 10 different entities and persons, including Defendant Garrabrants, to show that BofI loaned money to Galanis.

120. The analysis performed by Real Talk Investments provides additional or more authoritative fraud-related information than the publicly available information. By connecting individual pieces of unrelated complex economic data and explaining the implications of such connected information, understandable only through Real Talk Investments' analysis that was not previously readily digestible by the marketplace, Real Talk Investments' interpretive corrective disclosure revealed to the public for the first time information that impacted the value of the stock. Among the information disclosed for the first time was the fact that BofI funds an entity called ECC SPE that is tied to Emerald Creek Capital and that Jason

Galanis took out a $7 million loan from Emerald Creek in early 2015 that has subsequently gone into delinquency since Galanis's arrest, and BofI holds the collateral behind the loan. This showed that, as a matter of fact, BofI was involved in a $7 million loan to Galanis.

121. Until Real Talk Investments' aggregation of unrelated complex economic data, the market had not aggregated such information and appreciated the implications of the linked information. Such aggregated information was understandable only through Real Talk Investments' expert analysis. As such, this is not an instance of mere repackaging of existing information.

122. On this news, BofI's share price fell $3.12 over a two-day decline or 14.53%, to close at $18.36 on October 28, 2016. This material stock price reaction to the *Seeking Alpha* article demonstrates that it contained new information that had not previously been incorporated into BofI's stock price.

123. On March 31, 2017, pre-market, the *New York Post* published an article entitled "Feds probe Bank of Internet for possible money laundering," disclosing that the Company was the subject of a probe led by the DOJ and involving the SEC and the Treasury Department. Notwithstanding the article, Bar Adon, the Company's Chief Legal Officer, ***denied that there were any material investigations that were required to be disclosed***. The article states in relevant part:

**Feds probe Bank of Internet for possible money laundering**

By Kevin Dugan March 31, 2017 | 1:27am | Updated

Federal agents are conducting a probe into possible money laundering at online lender Bank of Internet, The Post has learned.

The Justice Department, which is leading the investigation, has interviewed at least one former employee of the San Diego-based bank, sources said.

Bank of Internet Chief Executive Gregory Garrabrants, head of the bank since 2007, is also a focus of the probe, sources said. Neither the 18-year-old bank nor Garrabrants has been accused of any criminal activity.

Part of the probe is centered on regulatory filings made by Bank of Internet, also known as BofI, to the Office of the Comptroller of the Currency, according to four people familiar with the matter.

***

"Greg has answered these questions over and over again, and I don't know why you're all of a sudden coming up with all of this silliness, and in pursuit of what?" Eshel Bar-Adon, BofI's chief legal officer, told The Post.

Bar-Adon refused to answer questions about any possible criminal probe, but said the company was "completely unaware" of any indictments in the works.

"Due to false allegations made in short seller hit pieces and pending litigation, agencies routinely ask questions to assure themselves that such allegations are without basis," Bar-Adon added in a written statement. "However, there are no material investigations that would require public disclosure and BofI remains in good regulatory standing."

Spokespersons for the Justice Department and OCC, which is also investigating, declined to comment. The Securities and Exchange Commission and the Treasury Department, also in the probe, didn't answer an e-mail seeking comment.

It's not clear whether any of the probes will result in indictments.

124. The above information revealed to the market that Defendants did not speak in an accurate and complete manner when referencing the federal investigations. Defendants failed to disclose that the SEC and DOJ were investigating BofI and Defendant Garrabrants. Such investigations needed to be disclosed because their omission created the impression of a state of affairs that differed in a material way from the one that actually existed at that time.

125. On this news, BofI's share price fell $1.45 or 5.26%, to close at $26.13 on March 31, 2017. This material stock price reaction to the *Seeking Alpha* article demonstrates that it contained new information that had not previously been incorporated into BofI's stock price.

126. On April 6, 2017, the *New York Post* published a second BofI article entitled "Feds Probe of Bank of Internet Helped by Aquarium Employee." The article further disclosed the investigations and wrongdoing that was occurring at BofI and states:

**Feds probe of Bank of Internet helped by aquarium employee**

By Kevin Dugan April 6, 2017| 10:26pm | Updated

A federal probe into possible money laundering by a fast-growing online bank got a big assist from an unlikely source: a greedy $10-an-hour part-time aquarium cleaner, court papers reveal.

Michael Procopio, 42, the husband of the bank's former marketing boss, pocketed hundreds of thousands of dollars in bogus consulting fees arranged by his wife.

Kristi Procopio, 43, told her superiors at the Bank of the Internet, or BofI, that her hubby was a consultant needed to complete marketing work….

The couple set up a sham consulting shop and together siphoned $500,000 from BofI….

Michael and Kristi were busted last year on embezzlement charges … and were sentenced … to four years in prison and ordered to repay $525,002.

Meanwhile, Kristi is telling authorities – including the San Diego US Attorney, the Securities and Exchange Commission and the FDIC – what she knows about alleged lax accounting and possible money laundering at BofI, court papers show.

***

BofI executives told the Post they were "completely unaware" of any investigations.

They have denied any wrongdoing….

The scheme was able to go on for so long because the bank had "a poor internal auditing system," the DA's office said.

Justice, the SEC, and Treasury have previously declined to comment on any investigation. The FDIC didn't immediately respond to an e-mail seeking comment on its investigation, which hasn't previously been reported.

***

Eshel Bar-Adon, Bofi's chief legal officer, said, "Ms. Procopio has pursued a vendetta against the bank, and has made numerous false allegations in a class action lawsuit and elsewhere.

> "She is lying again now," Bar-Adon said in a statement to The Post. "No agency has taken legal or regulatory action as a result of her false allegations, and we do not expect any action will be taken."

127. The article provides material new revelations about the depth of the investigations by disclosing for the first time that the FDIC was involved in the same probe, was conducting a formal proceeding, or was at least contemplating legal proceedings. As stated in the article, the FDIC's investigation was not previously reported.

128. Although the article states that court papers show that Kristi Procopio, the former BofI employee, was telling the U.S. Attorney, the SEC and the FDIC "what she knows about alleged lax accounting and possible money laundering at BofI," the article *does not* state that court papers were the source for the author's statement that the FDIC was also conducting its own investigation.

129. On this news, BofI's share price fell $.31 or .01%, to close at $24.15 on April 7, 2017.

130. On October 25, 2017, the *New York Post* published a third BofI article entitled "Bank of Internet Was under 16-month SEC investigation." The article disclosed that the Company was indeed the subject of a 16-month formal SEC investigation and proceeding, or at least was contemplating a material legal proceeding until June 2017, when the SEC investigation (only) ceased without the SEC taking any action. The article was based on a report by *Probes Reporter* that

also became widely available to non-subscribers on October 25, 2017. Subscribers to *Probes Reporter* have access to various internal SEC documents and subpoenas that were made available to *Probes Reporter* through Freedom of Information Act ("FOIA") requests.

131. This revealed to the public that BofI was in fact the subject of a very material *formal* SEC investigation that lasted for 16 months, which speaks to the depth of the SEC proceeding, or the SEC's contemplation of legal proceedings.

132. On this news, BofI's share price fell $1.25 or 4.57%, to close at $26.09 on October 26, 2017.

133. A review of the SEC FOIA logs sheds light on who made FOIA requests that were granted in the seven-month span between BofI's March 31, 2017 denial and the October 25, 2017 article. The logs show that no SEC FOIA requests were submitted and granted between March 31, 2017 and July 27, 2017. Thereafter, only three individuals, apart from J. Patrick Gavin of *Probes Reporter*, requested and possibly received *any* information about BofI between July 28, 2017 and October 25, 2017. The individuals who possibly received any information regarding BofI are (i) Bradley Berning of Craig-Hallum ("Berning"), (ii) Darb Reerg ("Reerg"), and (iii) Wilbur Huggens ("Huggens"). *See* Exhibit A attached hereto.

134. The SEC FOIA requests for these three individuals mentioned above are marked "closed", but that does not mean that the information requested was

provided to them prior to October 25, 2017. *See e.g.*, William D. Cohan, *Stonewalled by the SEC*, *New York Times* (May 13, 2010 9:28 PM), https://opinionator.blogs.nytimes.com/2010/05/13/stonewalled-by-the-s-e-c/ (explaining that correspondence from the SEC stated that "'[b]ecause the records [you requested] are voluminous, they must be processed on a first-in, first out track as explained in our response to you. Note, your request has been closed and removed from our pending caseload.'").

135. Moreover, there have been instances where the SEC has stated that it would take years to provide information to the requestor. *See, e.g.*, *id.* (SEC stated it would be 12 months or more before request could be processed); *Cuban v. SEC*, 744 F. Supp. 2d 60, 65, 90-91 (D. D.C. 2010) (stating that even though the case was commenced 15 months ago, the SEC sought an additional three years to complete the processing of Marc Cuban's FOIA requests). While the majority of requests do not take years to fulfill, significant delays happen. Obviously, the response time for each request will be different, and two requestors seeking the same information may encounter different response times if their requests are worded differently.

136. In addition, the SEC often refuses to provide information regarding investigations in response to FOIA requests.

137. Berning is a senior analyst with Craig-Hallum who has been submitting SEC FOIA requests regarding BofI for the last few years. On July 25, 2016, Craig-

Hallum released Berning's research report on BofI entitled "SEC FOIA Request Reveals No SEC Investigation into BOFI; Recent Pressure on Stock Creates Buying Opportunity". Unless leaked to the general public, Bradley Berning's research reports are only available to Craig-Hallum's clients, which are typically institutions, and are otherwise not available for purchase. The report states that he submitted a FOIA request to the SEC seeking "any correspondence between the SEC and BOFI or any of its subsidiaries." In response, *the SEC provided only one SEC Comment letter* dated May 13, 2015 reviewing the June 30, 2014 10-K. It appears that neither the February 22, 2016 SEC subpoena, nor the SEC documents showing that a formal investigation was commenced, was provided to Berning. Berning's report states: "Our research supports BOFI's previous statements that there are no investigations into the Company."

138. On August 31, 2016, another Berning research report was issued which discusses the various FOIA requests made by Berning of Craig-Hallum. The report states: "Overall Conclusion: We are not asleep at the wheel. We are continuing to investigate and research. Of course there cannot be 100% certainty for an outside observer who is not privy to non-public SEC actions or information. We believe the mosaic of information gives a strong argument there is not a SEC investigation into BofI…."

139. According to *The Fly*, a digital publisher of real-time financial news available to paying subscribers, on March 31, 2017, Berning issued another research report noting that "there are 'more malicious headlines' out today from the NY Post going after BofI Holding claiming a DoJ investigation . . . but he does not believe it is true, adding that much of the rest of the article rehashes items that he has covered and addressed in the past [including the possibility of an SEC investigation]. The analyst believes there are several external data points that confirm regulators do not have issues with BofI Holding…."

140. *The Fly* also reported that on April 7, 2017, Berning noted that the *New York Post's* "source is a former employee fired from the bank that he views as 'absolutely not credible'".

141. According to *The Fly*, even as late as October 4, 2017, which is after the SEC granted and closed Berning's FOIA requests submitted in the summer of 2017, Berning stated that he was in receipt of the letter from the SEC to BofI dated June 28, 2017 concluding that there was no action to be taken against the Company. However, *The Fly* does not refer to any other documents showing that a formal SEC investigation had been going on for 16 months.

142. Plaintiffs have no knowledge as to what information Reerg and Huggens requested or may have received.

143. Given that between March 31, 2017 and October 25, 2017, only three individuals sought and may have received information from the SEC pertaining to BofI, and the alleged new information set forth in the October 25, 2017 *New York Post* article was not widely disseminated prior to October 25, 2017, there is no basis to assume that the public was aware of such revelations prior to October 25, 2017.

144. Additionally, between July 27, 2017 and October 25, 2017 (the dates when FOIA requests were submitted), there was only a single material drop on September 7, 2017. This was due to an article posted on September 6, 2017, after trading hours. The article was published on *Stock News Gazette*, and was titled "The Fundamental Case for and Against BofI Holding, Inc." This article says nothing about SEC investigations or FOIA requests. Therefore, the lack of material declines in the stock price between July 27, 2017 and October 25, 2016, is further evidence that the public was not aware of the 16-month SEC investigation prior to October 25, 2017.

145. This is further supported by the material drop in BofI's price when the article was released to the public. As such, it cannot be said that the new information disclosed in the article had already been incorporated into the market price by the time the article was published.

146. The vast majority of SEC investigations end without the staff's recommendation for an enforcement action by the Commission, but that does not

mean that no action may ultimately result from the staff's investigation. The SEC sent a letter to the Bank dated June 28, 2017 that states (emphasis added):

> We have concluded our investigation as to BofI Holding, Inc. Based on the information this date, we do not intend to recommend any enforcement action by the Commission against BofI Holding, Inc. We are providing this information under the guidelines in the final paragraph of Securities Act Release No. 5310, which states in part that ***the notice "must in no way be construed as indicating that the party has been exonerated or that no action may ultimately result from the staff's investigation."***

147. Although the SEC investigation ended without the staff recommending an enforcement action, its presence confirmed the existence of material federal investigations into BofI that should have been disclosed. There is no basis to conclude that the other investigations have been concluded.

148. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiffs and other Class members have suffered significant losses and damages.

149. The market for BofI common stock was open, well developed and efficient at all relevant times. As a result of Defendants' materially false and misleading statements and failures to disclose, BofI common stock traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased BofI common stock relying upon the integrity of the market

prices of BofI common stock and market information relating to BofI, and were damaged as a result.

150. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of BofI's business and operations. When the truth about BofI was revealed to the market, the price of BofI's common stock fell significantly. The price declines removed the inflation from the price of BofI common stock, causing real economic loss to investors who had purchased BofI common stock during the Class Period.

151. The declines in the price of BofI common stock after the corrective disclosures came to light were the direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price declines in BofI common stock negate any inference that the losses suffered by Plaintiffs and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

152. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired BofI common shares traded on the NASDAQ during the Class Period (the "Class"); and were damaged upon the revelation of the

alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

153. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, BofI common shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by BofI or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

154. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

155. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

156. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, and operations of BofI;
- whether Defendants caused BofI to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of BofI securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

157. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

158. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- BofI common shares are traded in efficient markets;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NASDAQ, and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common shares; and
- Plaintiffs and members of the Class purchased and/or sold BofI common shares between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

159. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

160. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted

material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**Against All Defendants**

161. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

162. This Count is asserted against BofI and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

163. During the Class Period, BofI and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

164. BofI and the Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements

made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of BofI common shares during the Class Period.

165. BofI and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of BofI were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants, by virtue of their receipt of information reflecting the true facts of BofI, their control over, and/or receipt and/or modification of BofI's materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning BofI, participated in the fraudulent scheme alleged herein.

166. The Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements

made by them, other BofI personnel, or BofI's agents, to members of the investing public, including Plaintiffs and the Class.

167. As a result of the foregoing, the market price of BofI common shares was artificially inflated during the Class Period. In ignorance of the falsity of BofI's and the Individual Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of BofI common shares during the Class Period in purchasing BofI common shares at prices that were artificially inflated as a result of BofI's and the Individual Defendants' false and misleading statements.

168. Had Plaintiffs and the other members of the Class been aware that the market price of BofI common shares had been artificially and falsely inflated by BofI's and the Individual Defendants' misleading statements and by the material adverse information which BofI and the Individual Defendants did not disclose, they would not have purchased BofI's common shares at the artificially inflated prices that they did, or at all.

169. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

170. By reason of the foregoing, BofI and the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and the other members of the Class for substantial

damages which they suffered in connection with their purchase of BofI common shares during the Class Period.

## COUNT II

## Violation of Section 20(a) of The Exchange Act
## Against the Individual Defendants

171. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

172. During the Class Period, the Individual Defendants participated in the operation and management of BofI, and conducted and participated, directly and indirectly, in the conduct of BofI's business affairs. Because of their senior positions, they knew of the adverse non-public information regarding all of the unlawful conduct and investigations.

173. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to BofI's financial condition and results of operations, and to correct promptly any public statements issued by BofI which had become materially false or misleading.

174. Because of their positions of control and authority as senior officers and directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which BofI disseminated in the

marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause BofI to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of BofI within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of BofI common shares.

175. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by BofI.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: July 10, 2018

**POMERANTZ LLP**

By: */s/ Jeremy A. Lieberman*
Jeremy A. Lieberman (admitted *pro hac vice*)
Brenda Szydlo (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
E-mail: jalieberman@pomlaw.com
bszydlo@pomlaw.com

**POMERANTZ, LLP**
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone: (818) 532-6499
E-mail: jpafiti@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
E-mail: pdahlstrom@pomlaw.com

***Attorneys for Plaintiffs and the proposed class***

**CERTIFICATE OF SERVICE**

I hereby certify that on July 10, 2018, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/Jeremy A. Lieberman*
Jeremy A. Lieberman